Chester J. RYBICKI, et al., Plaintiffs,

v.

The STATE BOARD OF ELECTIONS OF the STATE OF ILLINOIS, et al., Defendants.

Miguel DelVALLE, et al.,

v.

The STATE BOARD OF ELECTIONS OF the STATE OF ILLINOIS, et al., Defendants.

Bruce CROSBY, et al., Plaintiffs,

v.

The STATE BOARD OF ELECTIONS OF the STATE OF ILLINOIS, et al., Defendants.

Nos. 81 C 6030, 81 C 6052 and 81 C 6093.

United States District Court, N.D. Illinois, E.D.

Jan. 20, 1983.

Before CUDAHY, Circuit Judge, GRADY, District Judge, and BUA, District Judge.

RYBICKI II

CUDAHY, Circuit Judge.

In our initial opinion of January 12, 1982 following the trial of these consolidated reapportionment cases, *Rybicki v. State Board of Elections*, 574 F.Supp. 1082 No. 81 C 6030 (N.D.Ill. Jan. 12, 1982) [hereinafter cited as *"Rybicki I"*], we ruled on the merits of challenges to Illinois' 1981 state legislative redistricting brought on behalf of black voters (the Crosby plaintiffs) and Republican and suburban voters (the Rybicki plaintiffs).[1] Our decision with respect

---

1. We also approved a Settlement Agreement reached between defendants and plaintiffs suing on behalf of Hispanic voters (the DelValle plaintiffs). *See Rybicki I,* at 1123–1124.

to the Crosby claims at the time of *Rybicki I* was, we believe, correctly based on the Supreme Court's most recent analysis of voting dilution claims as set forth in *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). After our January 12 opinion was issued, however, and while we were reviewing the Crosby plaintiffs' motion for reconsideration of the *Crosby* decision, Congress extended and amended the Voting Rights Act.[2] Consequently, in response to the Crosby plaintiffs' request, we have decided to reevaluate those of the Crosby plaintiffs' claims that we found wanting under the *Bolden* criteria to determine whether the evidence may be sufficient to show a possible violation of the amended Voting Rights Act. As a result of this reevaluation, we are tentatively of the view that in certain specific areas on Chicago's South Side the location of the district lines, in connection with highly concentrated black districts, and in light of all the relevant factors, may be suspect under the "results" test of the amended Act. Therefore, we request the Commission to redraw certain district lines

in the specific areas we identify below so as to correct these apparent districting deficiencies.

## I.

■ The legislative history of the amended Voting Rights Act clearly indicates that claims of vote dilution do come within the scope of the Act, S.Rep. No. 417, 97th Cong., 2d Sess. 30 n. 120 (1982). Further, in order to prove vote dilution, plaintiffs need not demonstrate that "the disputed plan was 'conceived or operated as [a] purposeful devic[e] to further racial ... discrimination.'" *Bolden,* 446 U.S. at 66, 100 S.Ct. at 1499. Instead, plaintiffs can prove a violation of the Act merely by showing "that the challenged system or practice, *in the context of all the circumstances in the jurisdiction in question, results* in minorities being denied equal access to the political process." S.Rep. No. 417, 97th Cong., 2d Sess. 27, U.S.Code Cong. & Admin.News 1982, p. 205 (emphasis supplied).[3] Under this "results" test,

2. On June 29, 1982, the President signed the extension of the Voting Rights Act, as amended. The legislative history states that one of the objectives in amending Section 2 was "to clearly establish the standards intended by Congress for proving a violation of that section." S.Rep. No. 417, 97th Cong., 2d Sess. 2 (1982), U.S.Code Cong. & Admin.News 1982, pp. 177, 178.
   The amended Section 2 reads as follows:
   Sec. 2. (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).
   (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Pro-*

*vided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
Voting Rights Act Amendments of 1982, Pub.L. No. 97–205, § 3, 1982 U.S.CODE CONG. & AD. NEWS (96 Stat.) 131, 134 (to be codified at 42 U.S.C. § 1973).

3. The House Judiciary Committee Report on the Voting Rights Act extension and amendment specifically identifies districting plans as within the scope of Section 2. H.R.Rep. No. 227, 97th Cong., 1st Sess. 30–31 (1981). This Report was based upon H.R. 3112, 97th Cong., 1st Sess. (1981), a bill whose wording was slightly different from the language ultimately enacted into law. The Senate Judiciary Committee Report, however, characterized the House and Senate bills as "virtually identical." S.Rep. No. 417, 97th Cong., 2d Sess. 3 (1982). Defendants do not dispute "at this juncture" the applicability of the amended Section 2 to this case. *Defendants' Memorandum in Response to August 6, 1982 Court Order* at 3. We do not think that applying Section 2 to the present districting plan presents issues of retroactive application because our analysis focuses on the future effects of this plan in the 1984, 1986, 1988, and 1990 elections. *See Hereford Independent School District v. Bell,* 454 F.Supp. 143 (N.D.Tex.1978) (mem.) (uphold-

we must "assess the impact of the challenged structure or practice on the basis of objective factors, rather than mak[e] a determination about the motivations which lay behind its adoption or maintenance." *Id.* Congress has provided us with a non-exclusive list of objective factors to guide us in determining whether in a particular case the challenged practice or structure violates Section 2. *See* S.Rep. No. 417, 97th Cong., 2d Sess. 28–29 & nn. 114–18 (1982). These factors are applied to this case in the following Section.

## II.

■ The focus of continuing concern in this case is on the South Side districts. The South Side majority black house districts contain high concentrations of blacks, much greater than 65% of the district population—the percentage generally presumed necessary for a minority population to elect a representative of their choice.[4] Further, the Crosby plaintiffs contended at trial that "[t]he boundary lines for Commission house districts 17, 18, 23, 24, 25, 31, 33 and 34 trace in great part the boundaries of the heavy black concentration in Chicago." *Crosby Plaintiffs' Proposed Findings of Fact* No. 97. They contend now that "the map adopted by the Court imposes the same racial wall as the Commission's original map, only now involving senate dis-

tricts 12, 16 and 17 (as revised) and house districts 23, 24, 31, 33 (as revised) and 36 (as revised)." *Memorandum in Support of Crosby Plaintiffs' Post-Trial Motion* 4. The "result" in terms of concentration of black populations in voting districts is clear; in connection with this concentration the alleged correspondence between district lines and racial divisions (characterized for rhetorical purposes as a "wall") must be examined further. For we must decide whether these "results" (high concentrations and correspondence between election district and housing segregation demarcations), either singly or in combination, and in the context of Chicago political realities, violate the Voting Rights Act.

We think it deserves notice at the outset that the complaints we address here have their root in the extremely marked housing segregation on Chicago's South Side. A large area on the South Side is more than 85% black. *See* Pl.Ex. 12. Given this segregation and the territorial basis of representation under our system, it is inevitable, absent the most outlandish gerrymandering, that at least the voting districts in the interior of this area will be very heavily black. Obviously, we deplore the extreme degree of housing segregation in this area; but there is no evidence before us that the design of voting districts has any impact on

ing application of Section 5 to election procedures adopted prior to, but administered in elections subsequent to, the effective date of the Voting Rights Act).

4. The 65% figure is a general guideline which has been used by the Department of Justice, reapportionment experts and the courts as a measure of the minority population in a district needed for minority voters to have a meaningful opportunity to elect a candidate of their choice. *See Mississippi v. United States,* 490 F.Supp. 569 (D.D.C.1979), *aff'd,* 444 U.S. 1050, 100 S.Ct. 994, 62 L.Ed.2d 739 (1980). The 65% guideline, which the Supreme Court characterized as "reasonable" in *United Jewish Organizations, Inc. v. Carey,* 430 U.S. 144, 164, 97 S.Ct. 996, 1009, 51 L.Ed.2d 229 (1977), takes into account the younger median population age and the lower voter registration and turnout of minority citizens.

Testimony in the instant case established that Representative Madigan and his staff were made aware of the 65% guideline by Mr. Brace,

their consultant, during the summer of 1981. (Tr. at 1957). At trial, witnesses for both sides referred approvingly of the 65% figure. (Tsui, Tr. at 26–27; Newhouse, Tr. at 623; Hofeller, Tr. at 403–04; Brace, Tr. at 1956–57). Moreover, defendants' expert testified that the 65% guideline had been used in state reapportionment and redistricting. (Brace, Tr. at 1957). The 65% standard was also referred to in the recent opinion of the three-judge court in *In re Illinois Congressional Districts Reapportionment Cases,* No. 81 C 1395, slip op. at 19 (N.D.Ill. 1981), *aff'd sub nom. McClory v. Otto,* 454 U.S. 1130, 102 S.Ct. 985, 71 L.Ed.2d 284 (1982).

We think it appropriate, however, to take judicial notice of the fact that in the March 1982 Democratic primary election for the new Senate District 18, a district redrawn at the behest of this court to include a 66% black population, black candidates were unsuccessful in their efforts to unseat the white incumbent Senator.

housing. Our ability in a redistricting case to deal with the problem is thus limited at best.

Congress has suggested that we consider certain factors in deciding a challenge to the result of an election practice or structure. The factors are set forth in the following excerpt from a Senate committee report:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

While these enumerated factors will often be the most relevant ones, in some cases other factors will be indicative of the alleged dilution.

The cases demonstrate, and the Committee intends that there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other.

S.Rep. No. 417, 97th Cong., 2d Sess. 28–29 (1982), U.S.Code Cong. & Admin.News 1982, pp. 206–207 (footnotes omitted).

These factors are in turn derived from the analysis in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). In *White*, the Supreme Court reviewed a three-judge district court's invalidation of the Texas 1970 legislative reapportionment. The significance of the case for present purposes rests in the approach taken by the district court and followed by the Supreme Court in invalidating multimember districts in Dallas and Bexar Counties. In looking at Dallas County, the district court considered the history of Texas politics, including the effect of official racial discrimination on the right of blacks to register and vote and to participate in the democratic process; the use of a system that enhanced the opportunity for racial discrimination; the fact that since Reconstruction there had been only two blacks in the Dallas County delegation to the Texas House of Representatives; the fact that a white-dominated organization effectively controlled Democratic Party candidate slating in Dallas County and thus had great influence over elections; the fact that this organization did not need the support of blacks to win elections and therefore did not concern itself with political and other needs and aspirations of blacks; and the fact that this organization used racial campaign tactics in white precincts to defeat black-supported candidates. The district court thus concluded that " 'the black com-

munity has been effectively excluded from participation in the Democratic primary selection process,' ... and was therefore *generally not permitted to enter into the political process in a reliable and meaningful manner." White v. Regester*, 412 U.S. at 767, 93 S.Ct. at 2340 (emphasis supplied).

A similar approach was employed in analyzing the legality of the multimember district in Bexar County, a county with a significant Hispanic community. Here the district court considered the effect on political participation of discrimination in education, employment, economics, health, and other areas. The court concluded that "Bexar County Mexican-Americans 'are effectively removed from the political processes of Bexar [County] ....'" *White v. Regester*, 412 U.S. at 769, 93 S.Ct. at 2341.

The Supreme Court affirmed the district court's invalidation of the Dallas and Bexar Counties multimember districts. The Court accorded deference to the district court's careful consideration of the factual circumstances, and said with respect to Bexar County,

> [o]n the record before us, we are not inclined to overturn these findings, representing as they do a blend of history and an intensely local appraisal of the design and impact of the Bexar County multimember district in the light of past and present reality, political and otherwise.

*White v. Regester*, 412 U.S. at 769–70, 93 S.Ct. at 2341.

As we noted in our opinion of January 12, 1982, the record before us does not disclose a history of overt and systematic electoral discrimination comparable to that identified by the district court in *White v. Regester*. Illinois has never had a white primary or a poll tax. Most importantly, unlike the organization then in control of the Democratic Party in Dallas County, the Democratic organization in the City of Chicago depends upon the support of the black community to win elections and therefore must be at least somewhat responsive to

black voters' needs and aspirations. Indeed, rather than ignoring causes helpful to blacks, the Democratic Party in Illinois has been a principal exponent of civil rights legislation and of social legislation important to blacks. Also, unlike the situation in *White v. Regester*, many blacks have been elected to local office in Chicago and to state and national positions representing Chicago. Sixteen of the fifty aldermen in Chicago are black. Thirteen of the thirty-five state representatives and five of the nineteen state senators from Chicago districts are black. Three of the seven U.S. Representatives from Chicago are black. In sum, there has been no systematic exclusion of blacks from, or denial of meaningful participation in, Chicago's and Illinois' political processes comparable to the history outlined in *White v. Regester*.[5]

On the other side of the balance, we must give weight to our findings of purposeful dilution of black voting strength in the Commission's actions with respect to senate districts 14, 17 and 18 of the Commission Plan. We found that the *immediate* purpose of the Commission in drawing these districts was primarily to preserve the incumbencies of two white state Senators. We also found that "this process was so intimately intertwined with, and dependent on, racial discrimination and dilution of minority voting strength that purposeful dilution has been clearly demonstrated in the construction of Commission senate districts 14, 17 and 18." *Rybicki I*, at 1110.

We also note our finding that on Chicago's West Side there was fracturing and packing of blacks, the net effect of which was "the purposeful dilution of black voting strength on the West Side by at least one House District." *Id.* at 1112.

Further, we should take into account, to the extent relevant, in deciding whether the challenged practices deny blacks an equal opportunity to participate in the political process and to elect representatives of their choice, the poor socio-economic condi-

---

**5.** Following the issuance of this Opinion, Harold Washington was, on April 12, 1983, elected Mayor of Chicago, the first black to hold the office.

tions, unemployment, and traditionally low voter registration afflicting black communities in Chicago. Also, we recognize as part of this case's "totality of circumstances," that employment or other discrimination has been alleged and/or proven in such City units as the Chicago Police Department, the Chicago Housing Authority, the Chicago Board of Education, the Chicago Public Library, and the Chicago Park District. *See id.* at 1120.

Although it is unclear that the Crosby plaintiffs are arguing the issue of "packing" through excessive concentration of minority populations in voting districts except insofar as these concentrated districts may have boundaries that follow racial divisions, we think we should first consider whether the present concentration of blacks in election districts approved by this court, in the totality of circumstances and in and of itself, denies blacks equal access to the political process. The House Districts with particularly high black concentrations are District 23 (94.33% black), District 24 (98.43% black), District 25 (84.33% black), District 31 (98.44% black), District 32 (98.94% black), and District 36 (97.81% black). Three other South Side house districts have majority black populations. These are District 33 (66.37% black), District 34 (73.35% black), and District 26 (78.21% black). The four black majority West Side house districts are District 15 (66.32% black), District 17 (71.93% black), District 18 (77.05% black), and District 19 (76.31% black).

At the outset, we are inclined to remove from consideration those districts whose black population constitutes less than 80% of the district population. Given that 65% is a generally accepted threshold for providing an opportunity for minorities to elect a representative of their choice, it seems to us unnecessary in light of all the circumstances of this case to be concerned with districts whose black population is less than 15% above this threshold. In addition, there is evidence that in some circumstances minority representation may be in jeopardy even when the portion of minorities in a district exceeds 80%.

This leaves us with Districts 23, 24, 25, 31, 32, and 36—districts the black populations of which are, respectively, 94.33%, 98.43%, 84.33%, 98.44%, 98.94%, and 97.81% of the district total. The arguably illegal "result" of having these highly concentrated districts is not specific to any one of the districts; indeed blacks within each concentrated district have an obviously strong opportunity to elect representatives of their choice. Instead, the adverse result may be identifiable in terms of what might otherwise have occurred elsewhere. If keeping black majorities in districts below 80% were a primary objective of redistricting, fewer black votes would be "wasted" and instead would, at least in theory, be available to form black majority districts elsewhere.[6]

But this "wasting" of minority votes in and of itself does not, we believe, in the circumstances before us violate the Voting Rights Act. Given the present level of black participation in the political process and the ability of blacks to elect representatives of their choice, we cannot say that these highly concentrated districts, without more, demonstrate a Voting Rights Act violation. This is not to say that, in other circumstances in which the *White v. Regester* factors might weigh more heavily in favor of plaintiffs, high concentrations could not be found illegal. We determine only that in the case before us, and without more, they are not illegal. But we now confront the issue whether they may be tinged with illegality when considered in connection with the correspondence of district lines to lines of racial division (the "tracing" issue).

We could treat the tracing issue in either of two ways. First, we might consider

---

**6.** Inasmuch as house district 32 is an "interior" district, roughly in the center of the area of heavy black concentration on the South Side, it seems doubtful that, absent the most outlandish gerrymandering, district 32 could be deconcen-trated. Because of our conclusions in this case, however, we need not decide whether a different analysis should be used for "interior" versus "exterior" concentrated districts.

whether voting district lines corresponding to lines of racial division segregate black voters and whether this is unconstitutional without regard to dilution of voting strength. Second, we might consider whether, as a matter of dilution, the conjunction of highly concentrated black districts and the tracing of racial divisions in drawing district lines in some fashion results, in terms of the *Voting Rights Act*, in blacks having unequal access to the political process.

We think the latter approach is the only correct one in this vote dilution case. To the extent the Crosby plaintiffs seek to amend their complaint under Fed.R.Civ.P. 15(b) to assert new claims apparently alleging unconstitutional racial segregation and infringement of certain associational rights of black citizens, we regard such claims as essentially unrelated to the allegations upon which this action was premised.[7] This lawsuit was pleaded, tried and decided on a theory of dilution of, or gerrymandering of, black voting strength. Claims alleging unlawful racial segregation by voting district, in a fashion not encompassed within a charge of gerrymander-based vote dilution, were not pleaded, proved or decided here. *Compare, Wright v. Rockefeller,* 376 U.S. 52, 59, 84 S.Ct. 603, 606, 11 L.Ed.2d 512 (1964) (Douglas, J., dissenting). Also, nothing at trial has suggested that defendants have given their express or implied consent to resolution of such wholly distinct claims by this court. And we remain persuaded that any theory of segregation by voting district is fundamentally at odds with, or is at least inconsistent with, the idea of achieving sufficient minority concentrations in voting districts to enable minorities to elect representatives of their choice. This conclusion is dramatically illustrated by the fact that voting at large (and without districts) achieves the highest possible integration of racial and other minorities, but simultaneously pro-

vides such minorities with the least opportunity to elect representatives of their choice. Therefore, under these circumstances we cannot allow the Crosby plaintiffs to amend their complaint at this late stage to litigate these essentially unrelated claims. *See* 6 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1493 (1971).

However, in Part III B 3 of *Rybicki I,* we carefully considered plaintiffs' arguments regarding election district lines corresponding to racially segregated housing patterns insofar as these lines may contribute to excessive concentration (or "packing") and, therefore, "wasting" of the black vote. *Rybicki I,* at 1112. We found against plaintiffs, applying the *City of Mobile* criteria, because the evidence did not establish that the district lines were drawn with the purpose to dilute black votes. We now reconsider the evidence to determine whether, as plaintiffs allege, election district lines trace divisions between blacks and whites and whether this, by "packing" and "wasting" the black vote, violates the "results" test of the amended Voting Rights Act as applied to these circumstances.

Our first task is to determine whether and where such tracing takes place. The Crosby plaintiffs stated broadly in their proposed findings of fact that, "[t]he boundary lines for Commission House Districts 17, 18, 23, 24, 25, 31, 33 and 34 trace in great part the boundaries of the heavy black concentration in Chicago.... These lines create a 'wall' around the residentially segregated black communities in Chicago, thereby appearing to confer an official governmental sanction on the racial segregation which exists in Chicago." *Crosby Plaintiffs' Proposed Findings of Fact* No. 97. Similarly, in their memorandum supporting their post-trial motion, the Crosby plaintiffs referred to "the wall, which separates the races by faithfully tracking the

---

**7.** We note that we are unaware of any decision which has upheld a claim of segregation by voting district. Such a claim, we presume, would involve some analogy between voting districts and, for example, segregated schools

(where race was not an *explicit* attendance criterion) and school districts. In terms of associational factors, such an analogy would seem difficult to draw; but we need not reach the issue here.

lines of segregation in housing on the south side of Chicago for more than 16 miles," and complained that "the map adopted by the court imposes the same racial wall as the Commission's original map, only now involving senate districts 12, 16 and 17 (as revised) and house districts 23, 24, 31, 33 (as revised) and 36 (as revised)." *Memorandum in Support of Crosby Plaintiffs' Post-Trial Motion* 3–4.[8] Finally, the Crosby plaintiffs asserted that, "*every classification* made in the creation of this *16-mile barrier* was racially founded. The lines forming the wall were a concession to the racial animosity and hostility in the *white areas adjoining the wall*." *Reply Memorandum in Support of Crosby Post-Trial Motion* 15 (emphasis supplied).

In *Rybicki I* we did not perceive a need to establish in detail and with precision the facts involving the alleged tracing of racial divisions because we focused on the motives of the Commission, as required by *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), and found that they had not been shown to be unlawful. Now, however, we are instructed to look at the "results" of redistricting and the motives of the Commission are not controlling. Thus we should determine if in fact the Commission and court-adopted plan trace racial divisions and, if so, whether this in some fashion violates the Voting Rights Act.

We note at the outset that the allegations of the Crosby plaintiffs quoted above paint with too broad a brush. Instead, great specificity is required to appraise the precise location of district lines and the populations through which they run. Moreover, we must begin with at least a preliminary idea of what it means in the redistricting context to trace racial divisions.

Our analysis will focus on the populations of census tracts immediately adjacent to district lines that follow heavily concentrated (85%+) black census tracts in house districts 23, 24, 31, and 36.[9] We have two alternate ways of looking at the population data in testing the tracing allegation. First, we might find that tracing occurred where the district line runs between a highly concentrated (85%+) black census tract and a minimally concentrated black census tract. Thus our focus would be on "black" versus "non-black" census tracts. The second way of looking at the population data is to find that tracing occurred where the district line runs between a highly concentrated black census tract and a highly concentrated *white* census tract (or at least a tract containing a significant number of whites with no substantial non-black minority). From this viewpoint a district line drawn between a black census tract and a tract containing substantial numbers[10] of *non-whites* (other than blacks) would not be characterized as significantly tracing racial divisions.

We believe that the latter approach is the correct one. If we looked more broadly at the black versus non-black census tracts, we would not recognize the legitimate in-

---

**8.** We also note that house districts 17 and 18, the West Side districts singled out at trial by the Crosby plaintiffs as districts whose boundaries traced racial divisions, were altered in our original order in response to our finding of purposeful vote dilution. District 17 is now 71.93% black and district 18 is 77.05% black. Thus, they are not highly concentrated, *see supra* p. 1089, and further modification is clearly not required by the Voting Rights Act, *see supra* p. 1089.

**9.** Census tract data are contained in Pl.Ex. 28. Plaintiffs also objected to the lines of house district 33, as revised. Memorandum in Support of Crosby Plaintiff's Post-Trial Motion 4. This district, however, is only 66.37% black and therefore the lines do not contribute to any "packing" problem in this district. Further, plaintiffs do not challenge the lines of house district 32, an "interior" district, or house district 25, a district bordering Lake Michigan. Instead, plaintiffs challenge the house districts on the western side of the area of heavy black concentration. The allegation is that the district lines of these districts trace the racial division between whites to the west and blacks to the east.

**10.** For this purpose we have generally regarded a minority percentage of 33% or more as "substantial."

terests of non-black, non-white groups in avoiding the fracturing of their voting power.[11] For example, the district boundary along the southeast edge of house district 18 on the West Side, a 77% black district, runs between heavily concentrated black census tracts in District 18 and tracts 3005, 3006, 3007, 3008, 3003, 3002 and 2916, which are in house district 20. House District 20 is 71% Hispanic and its composition is prescribed by the Hispanic Settlement Agreement. *Rybicki I*, at 1123–1124 & n. 104. *Tract 3005* has a population of 3636 and is 75.9% Hispanic. *Tract 3006* is 69.8% Hispanic. *Tract 3007* is 89% Hispanic. *Tract 3008* is 90.1% Hispanic. *Tract 3003* is 46.7% Hispanic. *Tract 3002* is 88.6% Hispanic. Finally, *tract 2916* is 71.1% Hispanic. Similarly, the northeast boundary of house district 23, a 94% black district, runs between heavily concentrated black census tracts and tracts 3402 and 3404 in house district 19. These two tracts are 74% and 29.3% Asian and, we may take judicial notice that, together with tracts 3401 and 3403, they contain the area known as "Chinatown." Since we are not aware of a persuasive basis in law for fracturing one minority in the interest of deconcentrating another, we think it appropriate to examine an apparent tracing of a racial division as presenting a suspect circumstance under the Voting Rights Act only where a line runs between heavily concentrated black and substantially *white* census tracts (or at least tracts containing a significant number of whites with no substantial non-black minority), and where such a line arguably contributes to "packing" and

therefore "wasting" of black votes. We now turn to the evidence.

*House district 23* is a 94% black district on Chicago's near South Side. District 23's western boundary follows the eastern edge of six census tracts: tracts 3402, 3404, 3405, 6016, 6101, and 6108.[12] *Tract 3402* has a total population of 5319. Of this number, 3941 (74%) persons are Asian/Pacific Islanders, 991 (18.6%) are whites, 284 (5.3%) are blacks, and 103 (1.9%) are listed as other. In addition to and separate from the racial breakdown, 136 (2.5%) persons are listed as persons of Spanish origin.[13] *Tract 3404* has a total population of 1606, made up of 927 (57.7%) whites, 472 (29.3%) Asian/Pacific Islanders, 106 (6.6%) others, and 101 (6.2%) blacks. Tract 3404 has 273 (16.9%) persons of Spanish origin. *Tract 3405* has a population of 1785, with 1376 (77%) whites and 367 (20.5%) blacks. 79 (4.4%) people are Hispanics. *Tract 6016* has a population of 516, with 446 (86.4%) whites, 52 (10%) others, and 16 (3.1%) blacks. 107 (20.7%) persons in tract 6016 are Hispanic. *Tract 6101* has a population of 1220, with 1077 (88.2%) whites, 75 (6.1%) blacks, and 68 (5.5%) others. 178 (14.5%) persons are Hispanic. Finally, *tract 6108* has a population of 1939 with 1905 (98.2%) whites, 30 (1.5%) others, 3 (.1%) blacks, and 1 (.05%) American Indian. 140 (7.2%) persons are Hispanic. In sum, of the six census tracts just beyond the western boundary of house district 23, tract 6108 clearly meets our criteria for investigation. Tract 6101 is at least suspect since the largest non-white group is Hispanic and this group constitutes only

**11.** We would also be looking at something other than "white areas adjoining the wall," the situation of which the Crosby plaintiffs complain and the factual predicate for contentions about a racial "wall." *See supra* p. 1090.

**12.** Census tracts bordering the challenged districts can be identified by using Ct.Ex. 1A, which is a reproduction of the court-approved district lines superimposed on a census tract map of Cook County.

**13.** Because persons listed in census data as being of Spanish origin may be of any race, (Pl.Ex. 43, Bureau of the Census, U.S. Dept. of Commerce, *1980 Census of Population and*

*Housing—Illinois Advance Report* 3 (March 1981)), one cannot know from this data which of the five racial categories (white, black, American Indian-Eskimo-Aleut, Asian/Pacific Islander, and Other) should be reduced for present purposes to reflect the Hispanic concentration in a census tract. This does not pose a problem here, however, because for the purpose of identifying any tracing of racial divisions, we think that the existence of a substantial number (33% or more) of Hispanic voters in a census tract bordering a black district negates a finding of a suspect tracing of a racial division. *See supra* n. 9 and accompanying text.

14.5% of the district population. Similarly, tract 6016 bears investigation since it is only 20.7% Hispanic. Tract 3402 is 74% Asian and 5.3% black. Tract 3404 is 29.3% Asian,[14] 16.9% Hispanic, and (depending on the race of the Hispanics) up to 6.2% black. Tract 3405 is 20.5% black with no other substantial minority.

*House district 24* is a 98% black district immediately south and west of house district 23. The district line under investigation here runs along the border of census tracts 6109, 6110 and 6119. *Tract 6109* has a population of 1472, with 1048 (71.1%) whites, 302 (20.5%) blacks, 119 (8%) others, and 3 (.2%) American Indians. 184 (12.5%) persons are Hispanic. *Tract 6110* has a population of 1700, with 1054 (62%) blacks, 337 (19.8%) whites, 301 (17.7%) others, and 8 (.4%) Asians and American Indians. 395 (23.2%) persons are Hispanic. *Tract 6119* has a population of 4791, with 1774 (37%) whites, 1726 (36%) blacks, 1275 (26.6%) others, and 16 (.3%) Asians and American Indians. 1999 (41.7%) persons in tract 6119 are Hispanics. Tracts 6109 and perhaps 6110 are at least suspect under our criteria.

*House district 31*, the next district whose boundary is in question, is a 98% black district. It is bordered by census tracts 6119, 6118, 6117, 6705, 6714, 6610, 7001 and part of 7005. *Tract 6119*, which also borders district 24, has a population of 4791, with 1774 (37%) whites, 1726 (36%) blacks, 1275 (26.6%) others, and 16 (.3%) Asians and American Indians. 1999 (*41.7%*) persons in this tract are Hispanics. *Tract 6118* has a population of 3620, with 2261 (62.4%) whites, 772 (21.3%) others, 572 (15.8%) blacks, and 15 (.4%) Asians and American Indians. 1673 (*46.2%*) persons in this tract are Hispanics. *Tract 6117* has a population of 3585, with 2465 (68.7%) whites, 942 (26.2%) others, 158 (4.4%)

blacks and 20 (.5%) Asians and American Indians. 1750 (*48.8%*) persons in this tract are Hispanic. *Tract 6705* has a population of 2254, with 2150 (95.3%) blacks, 71 (3.1%) whites, 31 (1.3%) others, and 2 (.08%) Asians and American Indians. 57 (2.5%) persons in this tract are Hispanic. *Tract 6714* has a population of 3006, with 2950 (98.1%) blacks, 51 (1.6%) whites, and 5 (.1%) Asians and others. 20 (.6%) persons in this tract are Hispanic. *Tract 6610* has a population of 5606, with 3241 (57.8%) whites, 2029 (36.1%) blacks, 248 (4.4%) others, and 88 (1.5%) Asians and American Indians. 367 (6.5%) persons are Hispanic. *Tract 7001* has a population of 3283, with 3148 (95.8%) whites, 105 (3.1%) others, and 30 (.9%) Asians and American Indians. 150 (4.5%) persons are Hispanic.[15] *Tract 7005* borders both district 31 and district 36, the next district to the south. Tract 7005 has a population of 11,162, with 9876 (88.4%) whites, 1083 (9.7%) blacks, 140 (1.2%) others, and 63 (.5%) Asians and American Indians. 285 (2.5%) persons are Hispanic.

To summarize district 31, tracts 6119, 6118, and 6117 are each 40+% Hispanic. Tracts 6705 and 6714 are each 90+% black. Tract 6610 is 57.8% white and 36.1% black. Tracts 7001 and 7005 clearly bear investigation. Tract 6610 is at least suspect.

*House district 36*, a 97.8% black district, is the next district to south. It is bordered by the southern half of tract 7005 and tracts 7201 and 7202. *Tract 7005*, detailed above, has less than a 15% minority population. *Tract 7201*, has a population of 4104, with 3541 (86.2%) whites, 523 (12.7%) blacks, 21 (.5%) Asians and American Indians, and 19 (.4%) others. 35 (.8%) persons are Hispanic. *Tract 7202* has a population of 4886, with 3389 (69.3%) whites, 1412 (28.8%) blacks, 43 (.8%) others, and 42 (.8%)

---

**14.** On the assumption that the 29.3% Asian minority is part of "Chinatown," *see supra* p. 1091, we think it is "substantial" for our purposes even though this minority is slightly below the 33% "threshold" we have generally followed. *See supra* n. 9 and accompanying text.

**15.** Although the data we have for tract 7001 are for the entire tract, the tract itself is divided between house districts 29 and 30. Thus only approximately two-thirds of the area of 7001 is in the district immediately adjacent to house district 31. The heavily white composition of tract 7001, however, negates a need to more precisely determine the racial percentages in the area that is adjacent to district 31.

Asians and American Indians. 80 (1.6%) persons are Hispanic. In summary, tract 7201 has less than 15% minority population and bears investigation. Tract 7202 is at least suspect.

## Summary

As we review the evidence, we thus find several places in which district lines of highly concentrated black districts correspond to pronounced divisions between black and white populations. First, *tract 7201*, an 86.2% white tract in district 28, is adjacent to and separated by the district line from *tracts 7113 and 7303*, which are 96.3% and 97.4% black tracts in district 36. Second, *tract 7005*, an 88.4% white tract in district 29, is set off from tracts *7105 and 7112*, 98.4% and 97.1% black tracts in districts 31 and 36. Third, *tract 7001*, a 95.8% white tract which is primarily in district 29, borders *tract 7104*, a 98.4% black tract in district 31. Fourth, *tract 6108*, a 98.2% white tract in district 21, borders *tract 3702*, a 97.6% black tract in district 23.[16]

We also find several places in which the district lines, though not corresponding to such marked racial divisions, nevertheless correspond to significant divisions between blacks and whites and therefore are at least suspect in this case. First, *tract 7202*, a 69.3% white tract in district 28, adjoins *tracts 7304 and 7306*, 95.7% and 97.6% black tracts in district 36. Second, *tract 6610*, a 57.8% white tract in district 29, adjoins *tract 6720*, a 98% black tract in district 31. Third, *tract 6109*, a 71.1% white tract in district 22, adjoins *tracts 6122 and 3703*, 97.2% and 99.8% black tracts in district 24. Fourth, *tract 6110*, a 19.8% white tract in district 22, adjoins *tracts 6120 and 6121*, 93.2% and 92.7% black tracts in district 24. Fifth, *tract 6101*, an 88.2% white tract in district 21, with 14.5% Hispanics, adjoins *tract 3701*, a 98.3% black tract in district 23. Sixth, *tract 6016*, an 86.4% white tract in district 21, with 20.7% Hispanics, adjoins *tract*

*3406*, a 99.6% black tract in district 23. A few of these identified tracts are in districts included in the Hispanic Settlement Agreement (*i.e.*, tracts 6108, 6109, 6110, 6101 and 6016). *See Rybicki I*, at 1123 n. 104 (quoting from Hispanic Settlement Agreement). Any changes involving these tracts would presumably\require the consent of the DelValle plaintiffs.

Under the "results" test of the amended Voting Rights Act, we are tentatively of the view that over the long term, any rigid adherence in a significant number of places to well-defined lines of racial division between blacks and whites, in these unusual circumstances where concentrations of blacks exceeding 80% or 90% in voting districts are constrained by Lake Michigan on the east and the lines in question on the west, may have the *result* of contributing to some degree to "packing" and vote dilution. Adherence to these lines over time, we believe, may restrict the opportunity of blacks "to participate in the political process and to elect representatives of their choice." There are so many variables and factors of significance that we reach no final conclusion on the facts before us. But, based upon our tentative analysis, we request that the Commission resubmit to us alternate district boundary lines that deviate from the pronounced division between blacks and whites in the tracts we have identified, where highly concentrated black districts are involved. If the new lines include some blacks within "white" districts while, at the same time, including whites within "black" districts, we think this is not *per se* objectionable. The primary purpose, of course, should be to move away from using black-white boundaries as district lines in conjunction with districts that have very high black concentrations.

We recognize that if the addition of whites to districts would make them less than 80% black, this might result in the election of representatives from the white minority. There is evidence in the case

---

**16.** Tract 3405, which is adjacent to house district 23, is 77% white. It is not included within the tracts we have singled out, however, because the tract within district 23 to which it is adjacent, tract 3505, is 55% white. Thus, drawing the district line between tracts 3405 and 3505 did not trace a significant racial division.

making such a possibility quite credible. Further, we put house district 36 in a special category because this district has already been restructured (Ct.Ex. 1A) in order to provide a 66% black majority in senate district 18. It is obviously inappropriate to jeopardize the opportunity to elect a black Senator in this district by shifting the western boundary to include substantially more non-blacks. Therefore, we ask the Commission to report to us regarding what might be done about the western boundary of district 36 without undoing what this court has already done and without fracturing other substantial non-black minorities.

When the Commission makes such a submission, the court will hold a further hearing to evaluate its effect and to hear other relevant evidence. Thereafter we will make our final determinations in this case. Of course, in making adjustments, the Commission may make other boundary adjustments which may be required or desirable to satisfy all other relevant criteria.

We emphasize that we are addressing under Section 2 of the Voting Rights Act the *long-term results* in terms of vote dilution of drawing a significant number of district lines along arguably rigid divisions between blacks and whites. We believe elimination of this practice may be important in lending better long-run flexibility to the apportionment of election districts. We perceive no basis, however, to respond to this problem by adopting the "Coalition" or "Crosby" Redistricting Maps as long as the Commission is willing to correct the defects we identify. As we pointed out in our original opinion, "in view of the specific and relatively localized defects we have found, adopting such an 'outside' plan in its entirety would inappropriately preempt the redistricting procedure authorized by the people of Illinois and the agencies empowered by Illinois law." *Rybicki I*, at 1125 n. 108.

With respect to Judge Grady's separate opinion, we think he simply misconceives the nature of this proceeding. This case was brought on the admittedly race-conscious theory that the opportunity to achieve minority representation in the legislature should be enhanced by redrawing district boundaries. Under such a theory line-drawing is necessarily a race-conscious process. It is impossible and, we think, unlawful, to respond to a race-conscious claim with a color-blind remedy.[17] Thus Judge Grady's "color-blind" remedy proposed in his separate opinion of January 12, 1982, had been sought by none of the litigants and, to our knowledge, would be vigorously (and properly) rejected by all of them.[18] We believe that lines tracing divisions between racial and ethnic groups are properly viewed as one facet of a very complicated problem primarily involving the fairness of representation. With respect to the use of 65 percent as a population proportion providing a reasonable opportunity to elect a representative of choice, we are simply relying on a substantial body of law and of policy of the Department of Justice developed over a number of years. *See supra* n. 4.

### III.

Finally, with respect to the other post-trial motions of the parties, we decide the following.

The Commission's motion under Fed.R. Civ.P. 52 for amendment of this court's findings and conclusions contained in *Rybicki I* is denied. For the reasons ex-

---

**17.** Judge Grady's proposed approach is "a map drawn according to the traditional neutral criteria, without regard to what I believe is the constitutionally impermissible consideration of race or ethnic character.... Whatever the bloc voting effect of a colorblind map might be, it would be unintended." *Rybicki I*, at 1140–1141 (Grady, J., dissenting). Such an approach simply ignores the theory of plaintiffs' vote dilution claims, which are grounded in a presumption of "bloc voting." If Judge Grady is correct, the Crosby and DelValle complaints should have been dismissed at the outset.

**18.** The Supreme Court continues to analyze the legality of electoral systems in a race-conscious manner. *E.g., City of Port Arthur v. United States*, — U.S. —, 103 S.Ct. 530, 74 L.Ed.2d 334 (1982).

pressed in that opinion, we believe that plaintiffs adduced sufficient evidence of purposeful discrimination at trial; new arguments presented by the defendants, interpreting the statistics and testimony relied on for these findings of discrimination, do not persuade us to the contrary. Moreover, the Commission's argument that this court improperly refused to apply the burdens of proof formulated in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), was fully addressed and the Commission's position was rejected in *Rybicki I.*

With respect to the various motions of the Crosby plaintiffs other than the matters we have addressed above, we first note that these plaintiffs to a considerable degree reargue matters previously argued and briefed before us and addressed at length in *Rybicki I.* Further oral argument will not be helpful to us and, thus, we deny the Crosby plaintiffs' request for oral argument before deciding the other outstanding motions.

In addition to our analysis of the facts under the *"results"* test of the amended Voting Rights Act, we have carefully reconsidered our opinion and findings regarding the absence of *purposeful* vote dilution or racial gerrymandering related to the alleged districting "wall," including the briefs filed by plaintiffs, defendants and the amicus curiae. Insofar as purposeful discrimination is concerned, we find no basis to amend our findings pursuant to Fed. R.Civ.P. 52(b) or to hold a new trial under Fed.R.Civ.P. 59(a)(2) and we accordingly deny those motions.[19] The Crosby plaintiffs also request that we exercise continuing jurisdiction until after the next reapportionment to grant future relief in this case under section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973a(c) (1976). Section 3(c) states that a court "shall retain jurisdiction for such period as it may deem appropriate" in order to review changes in voting qualifications, prerequisites, standards, practices or procedures. 42 U.S.C. § 1973a(c) (1976). We deny plaintiffs' request that we retain jurisdiction until the next reapportionment since we do not think it appropriate or necessary in this case to retain jurisdiction for such an extended period.

We ask that the Commission make a submission in accordance with this opinion on or before February 7, 1983.

SO ORDERED.

---

**19.** To clarify our interpretation of *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), and the fifteenth amendment issue, we modify footnote 70 of our opinion of January 12, 1982 at page 54 to read as follows:

> [70] Justices Stevens (446 U.S. at 84–85, 100 S.Ct. at 1508–1509), White (446 U.S. at 102, 100 S.Ct. at 1517) and Marshall (446 U.S. at 104–05, 125–29, 100 S.Ct. at 1519–20, 1531–33) expressly stated that a vote dilution claim is cognizable under the Fifteenth Amendment. Because Justices Brennan and Blackmun did not articulate their view on this question, the majority view is unknown. In these circumstances, we believe it is appropriate to adopt the plurality view of the Fifteenth Amendment—a view which is also consistent with our reading of prior appellate opinions on this subject. *See McMillan v. Escambia County,* 638 F.2d 1239, 1243 n. 9 (5th Cir.), *cert. dismissed sub nom. City of Pensacola v. Jenkins,* 453 U.S. 946, 102 S.Ct. 17, 69 L.Ed.2d 1033 (1981). Even if Justice Brennan's opinion can be interpreted as an implicit approval of the application of the Fifteenth Amendment in vote dilution cases, this would not alter the result we reach in the instant case (as the Crosby plaintiffs apparently argue). It is evident that only two Justices—Brennan and Marshall—adopt the "discriminatory impact" standard for a Fifteenth Amendment claim, 446 U.S. at 94, 130–41, 100 S.Ct. at 1513, 1533–39; Justice Stevens, although accepting an "objective" approach, rejected any across-the-board application of the discriminatory impact standard, 446 U.S. at 85–86, 90, 100 S.Ct. at 1509, 1511. But five Justices—the plurality Justices, 446 U.S. at 63–65, and Justice White, 446 U.S. at 95, 101–03, 100 S.Ct. at 1514, 1517–18—expressly held that the Fifteenth Amendment requires proof of discriminatory purpose or intent. Thus, even if we were to recognize plaintiffs' claims here under the Fifteenth Amendment, we would apply the same standard—discriminatory purpose—as we do under the Fourteenth Amendment, as discussed *infra.*

GRADY, District Judge, dissenting in part and concurring in part.

The analysis in today's opinion seems to me to illustrate some of the difficulties inherent in any effort to draw district boundaries along racial lines. The distinctions made between districts on the "white" side of the wall which are mostly white and those which are white mixed with Hispanics and Asiatics are, I believe, unsupportable in light of the uncontradicted testimony that the purpose of drawing the line this way was to separate whites from blacks. That other groups, such as Hispanics, may also be separated from blacks in the process, and even mixed in with the whites who prefer them to blacks, seems to me immaterial in terms of the constitutional considerations I believe controlling in this case.[1] Aside from this fundamental problem, today's opinion illustrates the difficulty of deciding which racial lines—which "tracings" as they are called by the majority—are tolerable and which are not. I am unable to discern what principle runs through the analysis of the majority which could guide one to the conclusion that various "results" either do or do not pass muster.[2]

1. I realize that the majority rejects a constitutional analysis and views the case strictly in terms of the Voting Rights Act as amended. But I do not believe the amendment to the Voting Rights Act authorizes intentional racial segregation. While the effect of the amendment is to eliminate the intent *requirement* of the *Mobile* case, the amendment certainly does not legitimize the drawing of lines which have as their express purpose the separation of one race from another. In short, the Voting Rights Act, even as amended, has to be read in light of the Constitution, which, in my view, absolutely prohibits the drawing of district lines for the purpose of racial separation.

2. Whether the matter is viewed "as black versus non-black," or "black versus white plus non-whites other than blacks" (majority opinion, p. 1091), the question presented by viewing this case as simply a "packing" or "dilution" problem is, if one will excuse the expression, where do you draw the line? How much is enough but not too much? The majority again seems to endorse the "65 per cent formula" (see fn. 4, p. 1085, which appears to be the same as fn. 87 of the majority opinion of Jan. 12, 1982, with the exception that, in the final paragraph judicial notice is taken of the fact that 66 per cent was not good enough to elect a black candidate in Senate District 18 in the March 1982 Democratic Primary Election). This, in terms of practical politics, may seem good news for the *Crosby* plaintiffs; the revised map the majority has in mind may provide even greater majorities of black voters in any revised districts. I believe this would be an unfortunate "victory" for the black plaintiffs. For a recent expression consonant with my own views, *see* the dissenting opinion of Justice Powell in *Rogers v. Herman Lodge*, 458 U.S. 613, 628, 102 S.Ct. 3272, 3282, 73 L.Ed.2d 1012 (1982):

> This is inherently a political area, where the identification of a seeming violation does not necessarily suggest an enforceable judicial remedy—or at least none short of a system of quotas or group representation. Any such system, of course, would be antithetical to the principles of our democracy.

*See also* Part IV of Justice Stevens' dissent in the same case, 458 U.S. 650, 102 S.Ct. 3294.

The idea of a 65 per cent quota, guideline, or whatever it might be called, is as unacceptable to me as when I dissented originally, and for the same reasons. The failure of a black to be elected in a 66 per cent district is not, to me, evidence that the percentage should be raised, but, rather, evidence that the idea of a percentage is unworkable in the first place. Whether you are comparing whites versus blacks or whites versus blacks, Hispanics and Asiatics, the result is the same: it just will not work. And the effort to make it work runs counter to the goal of eliminating racial divisions in this country.

I realize, too, that these particular plaintiffs are not solely interested in the segregation question. Beyond that, perhaps even as much as that, they want proportional representation. The majority is no more committed to proportional representation than they were at the time the original opinions in this case were filed. The amendment to the Voting Rights Act makes explicit that, whatever the "totality of circumstances" test may mean, it does *not* require proportional representation. Thus, the further proceedings the majority contemplates in this case seem to me to be addressed to a virtually *de minimis* situation as far as the *voting* rights of blacks are concerned. This is not a case like *Mobile*, or *Rogers v. Herman Lodge, supra,* where blacks have been literally closed out of the political process by at-large elections in which they failed to elect a single representative. Here, the difference between what the plaintiffs have in the court-ordered map and what they want is the difference between representation which is not quite proportional and representation which is strictly proportional. If the majority is not bent on granting proportional representation, then I fail to see why there is need for a further hearing in this case.

I continue to disagree with the majority's view that this case was not tried on a theory of unconstitutional racial segregation. While it is true that the matter was unclear from the pleadings, there can be no doubt that during the trial the question of racial segregation, and the stigma resulting from the wall, was clearly presented. I would allow the motion of the Crosby plaintiffs to amend their complaint to conform with the proof.

I fail to see how the amendment to the Voting Rights Act requires any change in the map the majority approved in its opinion of January 12, 1982, and as long as the majority continues to see this case as one involving no constitutional issue, I believe that a further evidentiary hearing will be essentially unproductive. The "results" of the present map seem to me to have been fully analyzed by the majority in its opinion of January 12, 1982, and found acceptable.[3]

I do agree with the majority that no further argument is necessary regarding the evidence which has already been taken. Finally, I agree that we should not retain jurisdiction in this case until the next reapportionment. To that extent I concur in the majority opinion.

---

**3.** The majority frequently refers to "the 'results' test' of the amended Voting Rights Act." I do not read the amendment as providing for a "results" test. The phrase used to define the test for determining whether a protected group has "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice" is "the *totality of circumstances.*" The totality of circumstances would certainly include the "results" of a redistricting, but the results are not coterminous with the test. The test is the *totality* of circumstances, and it seems to me that the majority has already exhaustively analyzed those circumstances in its opinion of January 12, 1982. While I do not agree with that analysis, my criticism is not that it was cursory.