LATINO POLITICAL ACTION
COMMITTEE, INC., et al.,
Plaintiffs, Appellants,

v.

CITY OF BOSTON, Raymond Flynn, et
al., Defendants, Appellees.

No. 85–1484.

United States Court of Appeals,
First Circuit.

Argued Oct. 8, 1985.

Decided Feb. 19, 1986.

Joseph L. Kociubes, with whom John R. Snyder, Bingham, Dana & Gould, and Alan Jay Rom, Boston, Mass., were on brief, for plaintiffs, appellants.

Steven P. Perlmutter, Asst. Corp. Counsel, City of Boston Law Dept., with whom Mary-Ellen Nolan, Asst. Corp. Counsel, Boston, Mass., was on brief, for defendants, appellees.

Before COFFIN and BREYER, Circuit Judges, and TIMBERS,* Senior Circuit Judge.

BREYER, Circuit Judge.

In this case four nonprofit organizations (at least three of which represent Blacks, Hispanics and Asians) and twelve individuals challenge the City of Boston's new (1983) districting plan for the election of members of the City Council and of the School Committee. In their view the plan violates the federal Voting Rights Act of 1982, which forbids

> political processes leading to ... election ... [which] are not equally open to participation by members of [a racial or language minority] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973(b) (1982). They also allege related violations of the state and federal constitutions and federal civil rights acts (42 U.S.C. §§ 1981, 1983 and 1985(3)). They now appeal from a district court judgment rejecting their claims. After examining the detailed record with care, we conclude that it adequately supports the district court's findings, and we affirm its decision.

* Of the Second Circuit, sitting by designation.

I

This appeal represents the tail end of plaintiffs' partly successful efforts challenging Boston's districting system. The present system was created as a result of a 1981 referendum in which Boston residents voted to change the structure of the at-large nine member City Council and five member School Committee, so that each of these bodies would contain nine members elected from single member districts along with several members elected at large. (In 1982 the legislature set the number of "at large" members at four for each body.)

After the referendum, the City Council created a Special Committee to develop a specific districting plan. The Committee made it a priority to create two "minority" districts—an overriding concern of those who had testified before it (*Report of the Special Committee on Electoral Districts*, February 23, 1982). The Committee also sought to satisfy the following guideline:

> Each such district shall be compact and shall contain, as nearly as may be, an equal number of inhabitants, shall be composed of contiguous existing precincts, and shall be drawn with a view toward preserving the integrity of existing neighborhoods.

Mass.Gen.Laws ch. 43, § 131 (1977). The Committee reported a plan to the Council in early 1982, which then adopted it.

Several of the present plaintiffs (and others) then sued, claiming both that the plan violated constitutionally mandated "apportionment" requirements, see *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and that it impermissibly "diluted" minority voting strength. The district court agreed with the first ("one man/one vote") claim primarily because the Committee had relied on old (1975), rather than new (1980), census data. The court—without reaching the "minority vote dilution" claim—enjoined use of the plan. *Latino Political Action Committee*

*v. City of Boston,* 568 F.Supp. 1012 (D.Mass.1983), *stays denied, Latino Political Action Committee v. City of Boston,* 716 F.2d 68 (1st Cir.), *sub nom. Bellotti v. Latino Political Action Committee,* 463 U.S. 1319, 104 S.Ct. 5, 77 L.Ed.2d 1421 (1983) (Brennan, Circuit Justice).

The Special Committee then went back to work using 1980 census data. It drew a map with fairly compact districts and boundaries that placed much of the city's Black population (22.42 percent of Boston's 562,994 total population) in districts 4 and 7. These boundaries spread Hispanic population (6.41 percent of the city's total) more evenly throughout the city than Blacks, but still a large percentage of the Hispanic population was placed in district 7. The plan also placed most of the city's Asians (which constitute 2.69 percent of Boston's population) in district 2. (We have included the specific breakdown of the nine districts by population and racial composition in an Appendix.)

The City Council adopted this second, Committee recommended, plan in August 1983. The City of Boston held its November 1983 election in accordance with the plan, electing two Black members of the City Council, and one Black and one Hispanic member of the School Committee (along with two other Black School Committee members elected at large).

Plaintiffs, not satisfied with the new plan, went back to the court. They claimed that the new plan unlawfully "packed" minorities into a few districts, which fact, along with the spreading of the Hispanic voters, "diluted" minority vote strength, thereby depriving minorities of the "equal access" to the electoral process that section 2 of the Federal Voting Rights Act of 1982 guaranteed them. The district court held an evidentiary hearing. It then measured the effects of the plan against the several factors set forth as relevant in the legislative history of the 1982 Voting Rights Act. S.Rep. No. 417, 97th Cong., 2d Sess. 27, *reprinted in* 1982 U.S.Code Cong. & Ad. News 206–07. These factors include:

1. THE EXTENT OF ANY HISTORY OF OFFICIAL DISCRIMINATION IN THE STATE OR POLITICAL SUBDIVISION THAT TOUCHED THE RIGHT OF THE MEMBERS OF THE MINORITY GROUP TO REGISTER, TO VOTE, OR OTHERWISE TO PARTICIPATE IN THE DEMOCRATIC PROCESS.

2. THE EXTENT TO WHICH VOTING IN THE ELECTIONS OF THE STATE OR POLITICAL SUBDIVISION IS RACIALLY POLARIZED.

3. THE EXTENT TO WHICH THE STATE OR POLITICAL SUBDIVISION HAS USED UNUSUALLY LARGE ELECTION DISTRICTS, MAJORITY VOTE REQUIREMENTS, ANTI-SINGLE SHOT PROVISIONS, OR OTHER VOTING PRACTICES OR PROCEDURES THAT MAY ENHANCE THE OPPORTUNITY FOR DISCRIMINATION AGAINST THE MINORITY GROUP.

4. IF THERE IS A CANDIDATE SLATING PROCESS, WHETHER THE MEMBERS OF THE MINORITY GROUP HAVE BEEN DENIED ACCESS TO THAT PROCESS.

5. THE EXTENT TO WHICH THE MEMBERS OF THE MINORITY GROUP IN THE STATE OR POLITICAL SUBDIVISION BEAR THE EFFECTS OF DISCRIMINATION IN SUCH AREAS AS EDUCATION, EMPLOYMENT AND HEALTH, WHICH HINDER THEIR ABILITY TO PARTICIPATE EFFECTIVELY IN THE POLITICAL PROCESS.

6. WHETHER POLITICAL CAMPAIGNS HAVE BEEN CHARACTERIZED BY OVERT OR SUBTLE RACIAL APPEALS.

7. THE EXTENT TO WHICH MEMBERS OF THE MINORITY GROUP HAVE BEEN ELECTED TO PUBLIC OFFICE IN THE JURISDICTION.

8. WHETHER THERE IS A SIGNIFICANT LACK OF RESPONSIVENESS ON THE PART OF ELECTED OFFICIALS TO THE PARTICULARIZED

NEEDS OF THE MEMBERS OF THE MINORITY GROUP.

9. WHETHER THE POLICY UNDERLYING THE STATE OR POLITICAL SUBDIVISION'S USE OF SUCH VOTING QUALIFICATION, PREREQUISITE TO VOTING, STANDARD, PRACTICE OR PROCEDURE IS TENUOUS.

The district court, 609 F.Supp. 739, essentially found a history of economic, social and other forms of discrimination against minority groups in Boston. It also found that Boston's history of discrimination in the area of voting rights was less egregious than in certain other parts of the country, in the sense that Boston had never used formal rules (poll taxes, literacy tests, etc.) aimed at keeping minority voters from the polls. In fact, Boston's minority citizens had long actively participated in the electoral process. The court further found that Boston does not now follow practices (such as candidate slating processes) that tend to minimize the impact of minority votes; it follows some practices (such as permitting 'bullet' voting) that may increase minority influence; and Boston has recently changed its voting system to one of 'district selection,' a fact that should help increase minority voter influence. The court noted that racial issues still play a role in Boston's elections. It also found voting by racial blocs to a "significant" degree; it characterized such "racial polarization" as "moderate." It added that plaintiffs failed to show that Blacks and other minorities voted together as a single racial bloc. Finally, the court noted the recent electoral successes of Black and Hispanic candidates.

On the basis of these findings, the court concluded that plaintiffs had failed to show that the Council's districting plan deprived minorities of "equal access" to the "political process." The plaintiffs now appeal.

## II

In 1982 Congress amended section 2 of the Voting Rights Act partly in reaction to a Supreme Court case holding that proof that an electoral practice unlawfully discriminated against a minority required proof that state or local officials had a discriminatory *intent*. *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). Sponsors of the legislation said that proof of actual "intent" is often difficult to obtain; moreover, often a practice with a discriminatory "effect" would cause harm regardless of the "intent" that lies behind it. 1982 U.S.Code Cong. & Ad.News at 214–15. Consequently, Congress wrote into the statute a standard taken almost verbatim from the earlier Supreme Court case of *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), a case in which the court based its results on "the totality of circumstances." The Court wrote that

> The plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice.

*Id.* at 766, 93 S.Ct. at 2339 (citation omitted). It added that plaintiffs had to prove more than the simple failure of a racial group to secure "legislative seats in proportion to its voting potential." *Id.*

These statutory purposes and this history indicate that the language of the statute cannot be stretched as far as the appellants wish. They claim that section 2 forbids minority vote "dilution," which they would define as "minimization, cancellation or submergence of minority voting strength *below what might otherwise have been.*" They seem to mean (or, at least, to prevail they must mean) the italicized words quite literally—as encompassing virtually any other theoretically possible system of drawing voting lines that might give a minority group more voting power. So stringent an interpretation of the statute is not plausible, however, for it would require courts to make the very finest of political judgments about possibilities and effects—judgments well beyond their capacities. *See*

*Butts v. City of New York,* 779 F.2d 141, 151 (2d Cir.1985), *Terrazas v. Clements,* 581 F.Supp. 1329, 1348 (N.D.Tex.1984) (3 judge court); *Seamon v. Upham,* 536 F.Supp. 931, 949 (E.D.Tex.) (3 judge court), *rev'd on other grounds,* 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982). And, in any event, this interpretation is not consistent with the statutory caveat,

> That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973(b) (1982).

Without the benefit of so stringent a standard, however, appellants cannot prevail here on their Voting Rights Act claim. Rather, in our view, record support for the district court's factually-based determinations, is adequate. And, that being so, plaintiffs fail to show a "political process" that is not "equally open"—under any plausible reading of these quoted statutory words. We shall explain in the next section why we reach this conclusion.

### III

Appellants argue, here as in the district court, that the Council "packed" too many minority voters into districts 4 and 7; that it "fragmented" Hispanic voting power by placing small groups of Hispanics in several different districts; and that it placed the racially and ethnically diverse "South End" populations in a district dominated by nearly all-white South Boston. One result, they say, is "dilution" of minority voting power to the point where Black, Hispanic and Asian voters lack "equal access" to the voting process. The following features of the case, however, taken together, convince us that the district court's contrary conclusion was legally permissible.

First, appellants' case essentially involves the "effects" of certain numerical percentages. This case does not involve procedural rules, such as limited registration hours, that may directly impede minority voting efforts. Nor does it involve an attack upon at-large voting systems or multimember districts, which may be claimed to have an inherent tendency to minimize the voting strength of a minority group. *Rogers v. Lodge,* 458 U.S. 613, 616–17, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982). Most importantly, this case does not involve significant direct evidence of "discriminatory intent." To the contrary, the Committee explained its second districting plan as reflecting 1) the appellants' "view that 'minority districts' should range from 65% to 85% minority"; 2) its efforts "to consider the aspirations of the black and hispanic communities ... for access to public office"; 3) the views of two minority district council candidates who claimed to have informally polled the Black community, which, in their view, wished the Council to "make as few changes as possible" in the first plan; and 4) the absence of a practical suggestion for a "third secure minority district." *Report of the Special Committee on Electoral Districts,* August 10, 1983. Appellants may disagree with some of the Committee's conclusions, but they do not refute the statement of its motives and intent.

Second, if one assumes polarized voting by racial blocs, the district lines drawn should allow Black voters to elect two Black representatives or 22.2 percent of the nine elected from single member districts. Black voters account for about 18 percent of the city's voting age population. Two of the nine representatives elected in 1983 from single member districts to the thirteen-member City Council are Black; and on the School Committee, of the four at-large representatives, two are Black and of the nine single member district representatives, one is Black and one Hispanic. The results of the November 1983 election, while not necessarily in and of themselves proof of nondiscrimination, at least indicate that the district plan works to achieve Black representation, roughly, as its sponsors said they intended. *See* 42 U.S.C. § 1973(b) (second sentence) and 1982 U.S. Code Cong. & Ad.News at 208.

Third, the proportionate Black population of districts 4 and 7, 82.1 percent and 66.37 percent respectively, is not so high as

*automatically* to demonstrate a denial of "equal access" to the electoral process. Nor are the figures of 87.88 percent and 81.43 percent—which result if one adds Hispanics and Asians to Black voters—so high as to be *automatically* unlawful.

To understand why this is so, consider that "packing," to some degree may help, not hurt, minority voters. As appellants recognize, a degree of "packing" is necessary, where polarized voting exists, to account for the fact that say, Black or minority voters do not vote as completely cohesive blocs. In fact, the *less* cohesive the bloc, the *more* "packing" needed to assure, say, a Black representative (though, of course, the less polarized the voting, the less the need to seek that assurance).

Where voting is highly polarized, a 65 percent figure is a generally accepted threshold which has been used by the Department of Justice and reapportionment experts. *See Rybicki v. State Board of Elections of Illinois*, 574 F.Supp. 1147, 1149 n. 4 (N.D.Ill.1984) (3 judge court). Yet, this figure is highly judgmental. The appellants speak of an acceptable "range" of 65 percent to 75 percent. In *Rybicki*, the district court considered packing up to 80 percent to be automatically acceptable. *Id.* at 1152. It then analyzed packing where greater than 80 percent to see if other factors, together with the packing, made it unlawful.

■ In this case, the district court found a *moderate* degree of polarization. We cannot therefore find that the 82 percent "packing" figure is automatically unreasonable, or contrary to minority representational interests, for insofar as the "packing" figure is somewhat higher, it may reflect the lessened degree to which Black voters have similar voting preferences—the lessened degree to which they vote as a bloc. Similarly, the "packing" figure increases by six percentage points when Hispanic and Asian voters are added to Blacks and all together counted as "minority." But that figure must be discounted further to reflect diminished "polarization"—the increased extent to which individual voters may pursue separate interests or support different candidates when the "minority group" in fact consists of different ethnic 'subgroups.' (Black and Hispanic voters may differ on particular important issues in an election—for example, the value of bilingual education in a school election.) Given the difficulties of measuring such factors as 'the cohesiveness of bloc voting' or 'the degree of polarization', particularly if Blacks, Hispanics and Asians are treated as a single group, we cannot say the difference between the 75 percent 'packing' figures the appellants concede to be lawful and actual minority concentration in district 4 is so great as to undermine the district court's conclusion.

■ Fourth, and most important, appellants did not demonstrate the ready availability of a practical alternative plan that would significantly increase the "effectiveness" of minority votes without interfering with other legitimate line drawing considerations. Appellants allege that the Council might have created a 'third minority district.' Their effort (in the district court) to argue that the Council could, and should have created a 'third minority district' (based on a map showing hypothetical minority population of 42.6 percent, 93.4 percent and 66.6 percent in districts 3, 4 and 7 respectively) is undercut, however, by the conceded fact that the 'third district' population is insufficient for a 'safe district,' *Rybicki v. State Board of Elections of Illinois*, 574 F.Supp. at 1149 n. 4; *cf. Seamon v. Upham*, 536 F.Supp. at 945, and by the practical fact that appellants before the Committee supported (though for different purposes) a plan that also intended to "pack" Black voters into districts 4 and 7 (with a proportion of 76.72 percent and 70.66 percent of Black population respectively or 83.52 percent and 85.95 percent if Hispanics and Asians are added to Blacks). While alternative plans were presented, they are not so obviously both practical and better (from the minorities' perspective) as to make the Council's failure to adopt them a denial of "equal access" to the voting process.

■ Taken together, these factors—the nature of the case, the existence of two 'minority' districts, the results of the November 1983 elections, and the absence of a clear proof of an alternative that would have increased the effectiveness of the minority vote without impeding other legitimate districting considerations—show that (with respect to appellants' packing claim) the district court's decision was within its lawful powers. We cannot say that, in reality, in districts 4 and 7, the Council denied minorities "equal access" to the electoral process.

■ The appellants' remaining claims about unlawful dilution are weaker. They say that the Council's plan dilutes minority votes by fragmenting the Hispanic population across five districts. Boston's Hispanic population, however, is so numerically small (5.69 percent) that no single district with even a 25 percent Hispanic population could be created in light of the fact that the Hispanic population is dispersed geographically. Indeed, the distribution of the Hispanic population on Council's plan map is similar to that of the map supported by appellants before the Committee. Further, despite the small number of Hispanic voters, the City elected one Hispanic to the School Committee—under the challenged plan. As in *Terrazas v. Clements*, 581 F.Supp. at 1340, we see no obvious, practical way of creating a district with an Hispanic population majority without "creating a district that runs ... tentacle-like corridors." The district court's conclusions that the dispersal did not deny Hispanic voters "equal access" to the voting process, was, in our view, legally permissible.

*See id.* at 1357–58. ("Far from 'cracking' a cohesive hispanic community the district lines merely fail to string together dispersed pockets of hispanic population to maximize its voting strength.")

■ Finally, appellants claim that the Council, in creating district 2, 'diluted' the Asian minority vote by "submerging" the South End and Chinatown in a South Boston dominated district. The district court concluded, however, that any plan would inevitably place some minorities in districts dominated by whites; that the Asian population (2.69 percent) is so small its "submergence" is inevitable; and that even in district 2, these voters retained some ability to "swing" electoral outcomes in close cases. Again, we find the district court's conclusions adequately supported. We cannot say that the simple placing of the Asian vote in district 2 automatically amounts to a denial of an "equally open" electoral process.

For these reasons, we conclude that the district court's judgment is lawful in respect to appellants' Voting Rights Act claim. We note that appellants also have asserted various claims under related federal laws, as well as the federal and state constitutions. But, to prevail on these claims, appellants must satisfy a burden of proof equal to or greater than that already discussed. *Rogers v. Lodge*, 458 U.S. at 617, 102 S.Ct. at 3275; *City of Mobile v. Bolden*, 446 U.S. at 66–67, 100 S.Ct. at 1499–1500.

The judgment of the district court is, therefore,

*Affirmed.*

## APPENDIX