786 F.Supp. 704 (1992)
ILLINOIS LEGISLATIVE REDISTRICTING COMMISSION, et al., Plaintiffs,
v.
Gary J. LaPAILLE, et al., Defendants.
Joseph GARDNER, Lovana Jones, Dan Barreiro, William Shephard, Jr., John Lee Johnson, Gwendolyn Scott, Laura Barth, Warren Dorris, Marvin French, Jayme Cain, Percy Conway, Joseph Belman, Luis Albarasin, Crotis Teague, Jr., Henry Landrau, Carolyn Toney, Fred Smith, Charlie Wilson, Jr., and Bobby E. Thompson, on their own behalf and on behalf of all others similarly situated, Counter-Plaintiffs,
v.
ILLINOIS LEGISLATIVE REDISTRICTING COMMISSION, Al Jourdan, Frank Watson, Robert Churchill, Gene Hoffman, Dallas Ingemunson, George H. Ryan, sued in his official capacity as Illinois Secretary of State, and Illinois Board of Elections, Counter-Defendants.
No. 91 C 6318.
United States District Court, N.D. Illinois, E.D.
March 11, 1992.
Denying Motion to Amend Judgment June 11, 1992.
*705 *706 Steven Francis Molo, Dan K. Webb, Catherine W. Joyce, Thomas Vernon Skinner, Winston & Strawn, Chicago, Ill., James Robert Schirott, Schirott & Associates, P.C., Itasca, Ill., for Illinois Legislative Redistricting Com'n, Al Jourdan, Frank Watson, Robert Churchill, Gene Hoffman, Dallas Ingemunson.
Jeffrey D. Colman, Thomas Shane O'Neill, Jenner & Block, Chicago, Ill., for Illinois Legislative Redistricting Com'n, Al Jourdan, Frank Watson, Gary J. LaPaille, Bruce Crosby, Miguel Del Valle, Jim McPike, Jerome Joyce, Eartharin Cousin, Tom Lyons, Roland W. Burris, Joseph Gardner, Robert L. Lucas, Lovana Jones, Dan Barreiro, William Shepard, Jr., John Lee Johnson, Gwendolyn Scott, Laura Barth, Warren Dorris, Marvin French, Jayme Cain, Percy Conway, Joseph Belman, Luis Albarasin, Crotis Teague, Jr., Henry Landrau, Carolyn Toney, Fred Smith, Charlie Wilson, Jr., Bobby E. Thompson, Henry Martinez, Roberto Gonzalez, Anita Garcia, Maria A. Morales, Marta Caldero, Consuelo Zemaitis, J. Richard Mota, Dave Duran, Teresa Fraga Orosco, Beverly Area Planning Ass'n, William Gainer, Mt. Greenwood Civic Ass'n, Curt Mentzer, Paula Derbak, Sharon Hanlon, Thomas C. Hynes, Jeremiah Joyce, James Keane, Thaddeus Lechowicz, Robert J. Bugielski, Polish American Congress, Inc., Rebecca W. Owens, Gay E. Bruhn, Mary Finger, Marisa L. L'Heureux, Carol Travis, Wilfred G. Stewart, Mary Ellen Smyth, Sara Tompson, Mary Mari Anna Murphy, Ava George, Sandra M. Scott.
Richard J. Prendergast, Richard J. Prendergast, Ltd., Chicago, Ill., for Gary J. LaPaille.
Matthew J. Piers, Jonathan A. Rothstein, Gessler, Flynn, Fleischmann, Hughes & Socol, Ltd., Chicago, Ill., for Miguel Del Valle.
Joseph E. Tighe, Richard J. Prendergast, Ltd., Chicago, Ill., for Jim McPike, Jerome Joyce, Eartharin Cousin, Tom Lyons.
James R. Carroll, Roger Philip Flahaven, Illinois Atty. General's Office, Chicago, Ill., for Roland W. Burris.
Robert L. Tucker, Tucker, Watson, Butler & Todd, Joseph E. Tighe, Richard J. Prendergast, Ltd., William J. Harte, Stephen L. Garcia, Courtney Carlton Nottage, William J. Harte, Ltd., Chicago, Ill., for Joseph Gardner, Lovana Jones, Dan Barreiro, William Shepard, Jr., John Lee Johnson, Gwendolyn Scott, Laura Barth, Warren Dorris, Marvin French, Jayme Cain, Percy Conway, Joseph Belman, Luis Albarasin, Crotis Teague, Jr., Henry Landrau, Carolyn *707 Toney, Fred Smith, Charlie Wilson, Jr., Bobby E. Thompson.
Thomas Shane O'Neill, Jenner & Block, Arturo Jauregui, Ricardo Meza, Mexican American Legal Defense & Educational Fund, Chicago, Ill., for Mervin A. Mendez, Matias Rico, Heimelinda Ortega.
James D. Montgomery, James D. Montgomery & Associates, Ltd., Chicago, Ill., for The Task Force for Black Political Empowerment, Sen. Howard Brookins, Sen. Earlean Collins, Sen. Alice Palmer, Assion for Political and Economic Influence, Timuel Black, Robert Starks.
Before KANNE, Circuit Judge, NORGLE, District Judge, and ZAGEL, District Judge.

ORDER
NORGLE, District Judge.
Before the court are the plaintiff/counter-defendants' third amended complaint seeking a declaratory judgment upholding the validity of a redistricting plan for the Illinois General Assembly approved by the Illinois Supreme Court on January 14, 1992, and counterclaims by two sets of defendant/counter-plaintiffs challenging parts of that redistricting plan. A trial was conducted on February 4 through 7 and 11, 1992, after which the parties filed proposed findings of fact and conclusions of law. Also pending before the court is the plaintiff/counter-defendants' motion for summary judgment. For reasons that follow, judgment is entered for the plaintiff/counter-defendants and against the defendant/counter-plaintiffs on all claims.

BACKGROUND
The current claims are the latest arising from efforts to redistrict the Illinois General Assembly following the 1990 federal census. The Illinois Legislative Redistricting Commission and its Republican majority members (the "Redistricting Commission") filed the first complaint on October 4, 1991 in this court, seeking a declaration that the redistricting plan passed by the commission that day complied with relevant federal and state laws.[1] A parallel case, challenging the redistricting plan, was filed by the Illinois Attorney General on October 11, 1991 in the Illinois Supreme Court. That court remanded the redistricting plan to the Redistricting Commission on December 13, 1991 for hearings and consideration of alternative plans. People ex rel. Burris v. Ryan, 147 Ill.2d 270, 167 Ill.Dec. 893, 588 N.E.2d 1023 (1991). The commission held hearings from January 4 through 6, 1992, and passed a modified redistricting plan on January 6, 1992. The Illinois Supreme Court approved the modified plan on January 10, 1992 and issued an opinion four days later explaining its ruling. People ex rel. Burris v. Ryan, 147 Ill.2d 270, 167 Ill.Dec. 903, 588 N.E.2d 1033 (1992).[2]
The court-approved plan, which was supported by the Republican majority on the Redistricting Commission, created eighteen state House of Representatives districts and eight state Senate districts with African-American "super-majorities" (at least 65% of the population). The competing plan backed by the Commission's Democratic members provided for one less African-American super-majority House district and the same number of African-American super-majority Senate districts. Both the court-approved plan and its Democratic-backed alternative provided for four Hispanic super-majority districts in the House and two in the Senate.
Although the Illinois Supreme Court approved the Redistricting Commission's modified plan without change, the Commission, *708 joined by African-American voter David Reed ("Reed"), continued to press its declaratory judgment action in this court.[3]
Additionally, a group of African-American voters (the "Gardner counter-plaintiffs"), who had intervened in the proceedings before the Illinois Supreme Court and were named as defendants in the Redistricting Commission's third amended complaint, filed a counterclaim on January 17, 1992. The Gardner counterclaim included three counts, two of which were dismissed prior to the hearing.[4] The remaining Count I alleged two types of violations of the Voting Rights Act, 42 U.S.C. § 1973 et seq. First, it alleged the denial of African-American voters' "fair opportunity" to elect candidates of their choice in eight state House of Representatives districts (5, 6, 21, 23, 24, 26, 27 and 28) and three state Senate districts (3, 12 and 14) on the south side of Chicago, each of which have 65% or greater African-American populations. Second, it alleged diminution of minority voters' influence through "fracturing" of minority communities on the northwest side of Chicago (House District 33), where a 50% Hispanic district is possible, and in several areas with minority populations too small to constitute a majority in a district Leyden Township (House Districts 77 and 78), Waukegan (House Districts 59, 61 and 62), Aurora (House Districts 42 and 84), Rock Island-Quad Cities (House Districts 71 and 72) and Springfield (House Districts 99 and 100).
The Gardner counter-plaintiffs were granted leave on February 4, 1992 to file an amended counterclaim which added a "fracturing" claim for the Champaign-Urbana area (House Districts 103 and 104) to Count I and restated the previously dismissed Counts II and III.[5] The amended counterclaim also added Count IV alleging that the Redistricting Commission adopted its modified plan with the intention of discriminating against African-American and Hispanic voters in violation of these voters' 14th Amendment equal protection rights and their 15th Amendment voting rights.
A group of Hispanic voters (the "Mendez counter-plaintiffs"), some of whom had intervened in the Illinois Supreme Court case, filed a counterclaim on January 24, 1992, joining the "fracturing" claims of the Gardner parties with regard to the Hispanic communities on the northwest side of Chicago. This counterclaim also added "fracturing" claims for Hispanic communities on the southeast side of Chicago, in Leyden and Proviso Townships, Aurora and Waukegan. The Mendez parties, however, moved on January 31, 1992 to dismiss these latter claims voluntarily under Federal Rule of Civil Procedure 41(a)(2), leaving only their northwest side "fracturing" claims at issue.[6]
The five-day trial was conducted in a manner similar to that utilized in other redistricting cases, see, e.g., Hastert v. State Bd. of Elections, 777 F.Supp. 634, *709 639-40 (N.D.Ill.1991) (three-judge panel) (and cases cited therein), with evidence submitted in the form of affidavits, depositions, maps, statistical data, and the testimony of three expert witnesses under direct and cross examination. Afterward, proposed findings of fact and conclusions of law, and post-trial briefs, were filed by the plaintiff/counter-defendants Redistricting Commission and Reed, the Gardner defendant/counter-plaintiffs, the Mendez defendant/counter-plaintiffs, and a group of African-American defendants who have joined together as the Task Force for Black Political Empowerment (the "Task Force").

DISCUSSION

I. Res Judicata and Rooker-Feldman

The Redistricting Commission and Reed argued in their January 21, 1992 motion that the Gardner counterclaims were barred by the doctrine of res judicata because the Gardner parties either raised, or could have raised, the same claims before the Illinois Supreme Court. The Commission also contended that the Gardner parties are attempting to appeal the Illinois court's ruling to this court, which deprives this court of subject matter jurisdiction under the Rooker-Feldman doctrine. See District of Columbia Ct. of Apps. v. Feldman, 460 U.S. 462, 482, 103 S.Ct. 1303, 1314-15, 75 L.Ed.2d 206 (1983); Rooker v. Fidelity Trust Co., 263 U.S. 413, 416, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923). The court's January 24 opinion, dismissing Counts II and III of the counterclaim, reserved ruling on the res judicata and Rooker-Feldman issues. Illinois Legis. Redist. Comm'n, 782 F.Supp. 1272 (N.D.Ill. 1992). The Commission also raised these issues with regard to the Mendez counterclaim in a January 31, 1992 motion, and has continued to press these issues in its post-trial brief regarding both the Gardner and Mendez counterclaims.
State court judgments must be given "the same full faith and credit" including preclusive effectin federal court as they would receive in the courts of the rendering state. 28 U.S.C. § 1738; Pirela v. Village of North Aurora, 935 F.2d 909, 911 (7th Cir.), cert. denied, ___ U.S. ___, 112 S.Ct. 587, 116 L.Ed.2d 612 (1991). "To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." Montana v. U.S., 440 U.S. 147, 153-54, 99 S.Ct. 970, 973-74, 59 L.Ed.2d 210 (1979).
Under Illinois law, the doctrine of res judicata, or claim preclusion, provides that "a final judgment on the merits rendered by a court of competent jurisdiction bars any subsequent actions between the same parties or their privies on the same cause of action." Simcox v. Simcox, 131 Ill.2d 491, 497, 137 Ill.Dec. 664, 666, 546 N.E.2d 609, 611 (1989). Res judicata applies to claims that were, or could have been, raised in a prior action. LaSalle Nat'l Bank v. County of DuPage, 856 F.2d 925, 930-31 (7th Cir.1988) (discussing Illinois law), cert. denied, 489 U.S. 1081, 109 S.Ct. 1536, 103 L.Ed.2d 840 (1989). Similarly, collateral estoppel, or issue preclusion, "provides that an issue which has been addressed by a court of competent jurisdiction cannot be relitigated in a later action between the same parties or their privies...." Simcox, 131 Ill.2d at 496, 137 Ill.Dec. at 666, 546 N.E.2d at 611. The Redistricting Commission and Reed, as the parties asserting res judicata, have "the burden of showing with clarity and certainty what was determined by the prior judgment." LaSalle Nat'l Bank, 856 F.2d at 930.
The Illinois Supreme Court's four-page January 14 opinion explained that it approved the Redistricting Commission's modified plan on January 10 after considering four types of requirements: (1) the Illinois constitutional "equal population" requirement, (2) various Illinois and federal constitutional requirements, and federal statutory requirements regarding minority representation, "i.e., racial, ethnic and gender," (3) compliance with the Illinois constitutional "compactness" requirement, and (4) "all legal requirements regarding political *710 fairness." People ex rel. Burris, 147 Ill.2d 270, 295-97, 167 Ill.Dec. 903, 905-06, 588 N.E.2d 1033, 1035-36 (1992). That court found that the Commission's modified plan "meets all four requirements" without any further explanation of what federal constitutional and statutory requirements had been applied. Id. 147 Ill.2d at 296-97, 167 Ill.Dec. at 905-06, 588 N.E.2d at 1035-36. The only constitutional or statutory standard specified in the opinion was that for reviewing the Commission's work set forth in the Illinois Constitution; the modified plan was "valid unless it is against the manifest weight of the evidence." Id. 147 Ill.2d at 295-96, 167 Ill.Dec. at 905, 588 N.E.2d at 1035 (citing Ill. Const. of 1970, art. IV, § 3(b)). There were no specific findings as to any of the four general requirements listed in the opinion.
The "thrust" of the Illinois Supreme Court's opinion was its concern for the interest of the state's voters in holding elections on time. Id. 147 Ill.2d at 294-95, 167 Ill.Dec. at 905, 588 N.E.2d at 1035. This concern and a lack of resources or time, that court wrote, prevented it "from competently drawing a map that would take into account the diverse interests at stake in this litigation." Id.
The constraints which the Illinois Supreme Court expressed are understandable. Nonetheless, under the circumstances, this court cannot find that the Illinois Supreme Court's ruling precludes the federal claims at issue. It is unclear whether that court considered or made any findings with regard to the Voting Rights Act, the 14th Amendment, or the 15th Amendment. The Redistricting Commission and Reed have failed to meet their burden to show specifically what that ruling determined. Res judicata, therefore, cannot be applied.
The Redistricting Commission and Reed also contend that the Rooker-Feldman doctrine bars this court's review of the merits of the Gardner and Mendez parties' counterclaims. Under that doctrine, federal review of state court decisions is only available in the Supreme Court, except in habeas corpus cases. See Lynk v. LaPorte Super. Ct. No. 2, 789 F.2d 554, 563 (7th Cir.1986) (citing 28 U.S.C. § 1257; Feldman, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206; Rooker, 263 U.S. 413, 416, 44 S.Ct. 149, 150, 68 L.Ed. 362; and other cases). A federal district court, however, has subject matter jurisdiction over a federal constitutional challenge to a state law when review of a final state court decision is not necessarily required. Feldman, 460 U.S. at 482 n. 16, 486, 103 S.Ct. at 1316 n. 16; Keene Corp. v. Cass, 908 F.2d 293, 296-97 (8th Cir.1990).
The counterclaims here involve both federal constitutional and Voting Rights Act challenges to the modified plan approved by both the Redistricting Commission and the Illinois Supreme Court. Under the Illinois Constitution, once a plan is approved by the Commission and filed with the Illinois Secretary of State, the plan "shall have the force and effect of law...." Ill. Const. of 1970, art. IV, § 3(b). These steps took place on October 4, 1991. The Gardner and Mendez parties are therefore in effect challenging the validity of a state law. For purposes of determining applicability of the Rooker-Feldman doctrine, the court sees no reason to distinguish between the federal Constitution and the Voting Rights Act; both are vehicles for challenging state laws. Moreover, as already discussed, it is not clear what findings were made by the Illinois Supreme Court regarding federal law, or that that court made any findings at all with regard to the merits of the counterclaims before this court. Therefore, our consideration of the counterclaims will not involve review of the Illinois Supreme Court's ruling. Accordingly, the Rooker-Feldman doctrine does not deprive this court of jurisdiction over the counterclaims.

II. Voting Rights Act
Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, prohibits redistricting plans, as well as other laws or practices, which have the effect of denying or abridging minority voters' ability to participate in electoral contests. Chisom v. Roemer, ___ U.S. ___, 111 S.Ct. 2354, 2363-64, 115 L.Ed.2d 348 (1991). An allegedly *711 discriminatory effect is evaluated based on the "totality of the circumstances," with no requirement that the challenging parties show that the effect was intentional. Id.
The Supreme Court in Thornburg v. Gingles, 478 U.S. 30, 50-51, 106 S.Ct. 2752, 2766-67, 92 L.Ed.2d 25 (1986), set forth three preconditions for challenges to multimember legislative districts under § 2 of the Voting Rights Act, 42 U.S.C. § 1973, which appear to be applicable to § 2 challenges to single-member districting plans. See Hastert, 777 F.Supp. at 651-55. Those preconditions, which must be met before the "totality of the circumstances" can be addressed, are (1) that the challenging minority group be large enough to constitute a majority in a single-member district, (2) that the group is politically cohesive, and (3) that racial bloc voting typically prevents the minority group from electing candidates of its choice. Gingles, 478 U.S. at 50-51, 106 S.Ct. at 2766-67.
This court, in its earlier opinion granting in part and denying in part the Redistricting Commission and Reed's motion to dismiss, allowed the Gardner parties to proceed on some Voting Rights Act counterclaimsthe "fracturing" or "influence district" claimsfor which they could not meet the first Gingles precondition. Illinois Legis. Redist. Comm'n, 782 F.Supp. 1272, 1275 (N.D.Ill.1992). Finding that applicability of the Gingles preconditions to single-member district cases was not fully settled, the court allowed these counterclaims to proceed past the dismissal stage. Id. Accordingly, the Gardner and Mendez parties were allowed to present evidence to support their claims that African-American and Hispanic voting strength was illegally diluted (or "fractured") in some areas where these minorities lacked populations large enough to constitute a majority in any one district. Nonetheless, the court finds that the Gingles preconditions provide a useful analytical framework for this case.
Additionally, the court notes that it must defer to a state-approved redistricting plan and the "policies and preferences" it comprises to the extent possible consistent with the requirements of the Constitution and federal law. Upham v. Seamon, 456 U.S. 37, 40-43, 102 S.Ct. 1518, 1520-22, 71 L.Ed.2d 725 (1982).
The Voting Rights Act counterclaims are essentially of two types: (1) the Gardner parties' claims that certain "super-majority" districts with 65% or greater African-American populations do not contain sufficient numbers of African-American voters, and (2) the Gardner and Mendez parties' claims that minority communities were "fractured" into several districts in areas where these communities are not large enough to constitute majorities in a single district.

1. Super-Majority Districts
The Gardner parties claim that African-Americans lack a "fair opportunity" to elect candidates of their choice in eight House of Representatives districts and three Senate districts, all on the south side of Chicago, despite their super-majority status. The population statistics for these districts are as follows:

 District African-American population
 House total percent voting age percent
 5 63,399 65.4 41,892 62.7
 6 63,087 65.1 39,324 57.2
 21 63,812 65.9 46,060 64.3
 23 63,233 65.3 42,293 62.6
 24 66,248 68.4 41,510 64.8
 26 70,507 72.8 48,509 72.4
 27 63,032 65.1 47,065 65.0
 28 63,357 65.4 45,166 63.9

*712
 District African-American population
 Senate total percent voting age percent
 3 126,486 65.3 81,216 59.9
 12 129,481 66.8 83,813 63.7
 14 126,389 65.2 92,231 64.4

A 65% population of a particular minority has generally been regarded by courts, the Department of Justice, and reapportionment experts as sufficient to provide that minority group with a meaningful opportunity to elect candidates of their choice. See, e.g., United Jewish Orgs., Inc. v. Carey, 430 U.S. 144, 164, 97 S.Ct. 996, 1009, 51 L.Ed.2d 229 (1977); Latino Political Action Comm., Inc. v. City of Boston, 784 F.2d 409, 414 (1st Cir.1986); Ketchum v. Byrne, 740 F.2d 1398, 1413-16 (7th Cir. 1984), cert. denied, 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985); Hastert, 777 F.Supp. at 647 and n. 20; Rybicki v. State Bd. of Elections, 574 F.Supp. 1082, 1147 n. 4 (N.D.Ill.1982). The Gardner parties' expert witness, Kimball W. Brace, accepted the 65% guideline for this purpose in both Rybicki and, with qualifications, at trial in this case.[7] Some cases also discuss a 60% minority voting age population threshold. See, e.g., Hastert, 777 F.Supp. at 647 n. 20 (listing the 60% percent voting age figure in the conjunctive with the 65% overall figure, suggesting that both must be met); State of Mississippi v. United States, 490 F.Supp. 569, 575 (D.D.C.1979) (three-judge panel) (listing the voting age and overall figures in the disjunctive, suggesting that meeting either is sufficient) (cited in Ketchum, 740 F.2d at 1416), aff'd, 444 U.S. 1050, 100 S.Ct. 994, 62 L.Ed.2d 739 (1980). Each of the districts listed above meets the 65% overall threshold, and all but two (the House 6th and Senate 3d) meet the 60% voting age threshold, and those two narrowly miss that second guideline.
Nonetheless, the Gardner defendant/counter-plaintiffs and the Task Force defendants contend that African-American voters' opportunity to elect their chosen candidates is at risk in these districts. This claim is based on the splitting of African-American "communities of interest," including city wards and their political organizations, community groups and church congregations into several districts in the state-approved redistricting plan. The new districts contain fragments of various groups, which will likely at times support different African-American legislative candidates, according to this argument. The multiple African-American candidacies in Democratic Party primary elections will in turn allegedly enable candidates supported by substantial white bloc voting to win primaries and be elected because winning the Democratic nomination in Chicago is tantamount to election. Another aspect of the alleged violation, asserted by the Task Force, is the pairing of African-American and white incumbent legislators in the same districts, which makes the African-Americans' reelection more difficult. These problems are allegedly exacerbated by declining African-American voter turnout in the affected districts while white voter turnout has remained stable.
In support of these arguments, the Gardner and Task Force parties submitted election results from various elections, the expert *713 testimony of Brace, and the affidavit of a second expert, Roger K. Oden.[8]
According to the Gardner parties, the 1991 Chicago mayoral primary and general elections are particularly significant. Attached to the Oden affidavit were charts showing the results from the areas included in seven of the eight super-majority House districts being challenged (all but district 26) and the three super-majority Senate districts. In the primary, a white candidate, incumbent Richard M. Daley, outpolled African-American candidate Danny Davis in six of the seven listed House districts and in all three of the Senate districts, with Davis carrying only the area included in the new House District 28. A second white candidate, Jane Byrne, finished a distant third in all seven of the listed House districts and in the three Senate Districts. In the general election, Daley beat an African-American challenger, R. Eugene Pincham, by substantial margins in all seven listed House districts and all three Senate districts. The Gardner parties cite other elections as well, including the 1987 and 1989 Chicago mayoral elections, to show waning African-American turnout and the alleged vulnerability of African-American voting rights in the challenged districts. Brace, the Gardner parties' expert, based his opinion that the challenged districts violated the Voting Rights Act on these elections and some findings in Oden's affidavit, among other factors.
In response, the Redistricting Commission and Reed cite the testimony of their expert witness, Richard Engstrom, who found the challenged districts complied with the Voting Rights Act. Engstrom based his conclusion on results in the eleven most-recent elections in which voters in the areas at issue had a choice between an African-American or non-African-American candidate for a city, county or state office. In House District 26, the African-American candidates were the leading vote-getters in each of the eleven elections. In the other seven challenged House districts and each of the three challenged Senate districts, the African-American candidate led the vote in all but two of the elections. The two exceptions were the 1991 Chicago mayoral primary and general elections.
The court finds Engstrom's opinion to be better reasoned and better supported by the record than Brace's opinion to the extent there are conflicts between the two experts' testimony. Moreover, the Gardner parties bore the burden of showing that the challenged districts did not comply with the Voting Rights Act. That burden was particularly heavy in view of the 65% or greater African-American majorities in each of the eight House and three Senate districts at issue. Increasing the African-American majorities in those districts further would run the risk of diluting African-American voting strength through "packing," and thereby constitute a § 2 Voting Rights violation. See Gingles, 478 U.S. at 46 n. 11, 106 S.Ct. at 2764 n. 11 (dilution may be caused by dispersal or by excessive concentration of minority voters); Ketchum, 740 F.2d at 1408 n. 7 ("packing"wasting of voting strengthmay be evidenced by majorities greater than 65-70%); Hastert, 777 F.Supp. at 646 (packing wastes minority voting power and reduces minority influence in other districts). Based on the "totality of the circumstances," the Gardner parties have failed to show that the super-majority districts violate the Voting Rights Act in any respect. The super-majority districts provide African-Americans with a meaningful opportunity to elect candidates of their choice.

2. Fracturing
Two types of "fracturing" claims under § 2 of the Voting Rights Act have been raised in this case: (1) that a 50% Hispanic *714 district, which would allow Hispanic voters to elect candidates of their choice, should have been created in Chicago, and (2) that smaller African-American and Hispanic communities around the state should have been kept together rather than split among several districts, reducing the minority "influence" or "swing" potential.
Regarding the first type of claim, the Gardner and Mendez parties contend that Hispanic voting strength was diluted or "fractured" on the northwest side of Chicago by the lines of House District 33, which has a 39.4% Hispanic population and 33.9% Hispanic voting age population, when a 50% Hispanic district (44.3% Hispanic voting age) could have been created by reducing the Hispanic populations in two super-majority House districts: the 3d District (71.3% Hispanic, 67.3% Hispanic voting age) and the 4th District (70.5% Hispanic, 64.9% Hispanic voting age). The Gardner and Mendez parties assert that such a 50% Hispanic district would allow Hispanics to elect candidates of their choice, but that even if they could not, the larger Hispanic population would be able to "swing" elections between competing non-Hispanic groups.
The three experts who testified at trial Gordon G. Henderson for the Mendez parties, Brace for the Gardner parties, and Engstrom for the Redistricting Commission and Reedagreed that the 33d District could have been drawn to contain an Hispanic majority, but disagreed on the viability of such a district.
Both Brace and Henderson testified that Hispanic voters could elect candidates of their choice in the 50% district, in part because the roughly 44% Hispanic voting age population would equal the white voting age population, with African-Americans, Asians and Pacific Islanders constituting the remainder of the district. Additionally, Brace and Henderson felt that the Hispanic super-majorities in the 3d and 4th Districts were excessive. They testified that shifting enough Hispanics from those districts to push the 33d District Hispanic population up to 50% would not harm Hispanic voting strength in the 3d and 4th Districts, where the Hispanics would retain 68% majorities.
Engstrom considered 65% the appropriate opportunity-to-elect figure for all three of the districts, without closely evaluating the demographics of each district. Raising the 33d District to 50% Hispanic would therefore not be sufficient, he reasoned. Moreover, Engstrom felt the extra Hispanics in the 3d and 4th Districts, made those districts more secure and did not constitute "packing."
Initially, the court finds that the voting age population is a more significant factor than the overall population. McNeil v. Springfield Park Dist., 851 F.2d 937, 945 (7th Cir.1988) (those ineligible to vote are not parties to a § 2 vote dilution claim; citing with approval cases holding that voting age population is the relevant factor in applying the Gingles single-district majority precondition), cert. denied, 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989). There is no evidence that the 33d House District could be given an Hispanic voting age majority while retaining the Hispanic super-majority status in the 3d and 4th Districts. More importantly, the Gardner and Mendez parties have not shown that the 44.3% Hispanic voting age population they seek in the 33d District would be sufficient to give Hispanic voters an opportunity to elect candidates of their choice. The record, as well as the general 65% guideline, suggest that the Hispanic voting age population must be substantially higher than 44.3% to provide such an opportunity.
A second type of "fracturing" claimthat minority "influence" or "swing" voting potential was reduced by splitting up minority communitieswas raised by the Gardner and Mendez parties with regard to Hispanics on the northwest side of Chicago, and by the Gardner parties with regard to several smaller minority communities around the state. These other communities are as follows, showing the largest minority population both among the encompassing state-approved districts and in one of those districts under a map suggested by the Gardner parties:

*715
Area[9] House Dists. Top Min. Dist. Suggested
Waukegan 59, 61 and 62 36.5% (# 59) 44.2%
Leyden Township[*] 77 and 78 12.9% (# 77) 16.4%
Aurora 42 and 84 26.9% (# 84) 36.7%
Rock Island 71 and 72 15.0% (# 71) 16.0%
Springfield[**] 99 and 100 12.7% (# 100) 13.0%
Champaign-Urbana[**] 103 and 104 11.9% (# 104) 12.8%

An "influence" district claim under the Voting Rights Actalleging that the voting strength of minority communities was illegally reduced even though those communities were not sufficiently large and compact to constitute a majority in a single districthas been recognized by very few courts. See, e.g., Armour v. State of Ohio, 775 F.Supp. 1044, 1052 (N.D.Ohio 1991) (three-judge panel) (did not fully decide "influence" issue because found that African-American community constituting one-third of the voting age population could elect candidates of its choice); LeBlanc-Sternberg v. Fletcher, 781 F.Supp. 261, 271-73 (S.D.N.Y.1991) (denying motion to dismiss where racial motivation, not just effect, alleged).
A major problem with such "influence" claims is the lack of an objective limit to such claims. See McNeil, 851 F.2d at 947 ("Courts might be flooded by the most marginal section 2 claims if plaintiffs had only to show only that an electoral practice or procedure weakened their ability to influence elections."); Hastert, 777 F.Supp. at 653-55 (discussing potential problems of measuring injury, and finding that Gingles potential single-district majority precondition "cannot logically be limited" to challenges to at-large elections). The requirement that a minority group be large enough to control a district, not just "influence" it, enables the courts to adjudicate Voting Rights claims with a reasonable amount of efficiency and consistency. See Hastert, 777 F.Supp. at 654 (discussing court administration concerns).
The "swing" argument is based on the division between relatively large, stable voting blocs, such as the regular Democratic and Republican voters. If a minority bloc is independent, and is larger than the difference between the two major voting blocs, then the minority bloc can "swing" elections between the candidates favored by the two major blocs. Where such a pattern is established, candidates may be very responsive to the minority bloc's concerns in an effort to win their votes. See, e.g., Solomon v. Liberty County, Fla., 865 F.2d 1566, 1583 (11th Cir.1988) (noting lower court's finding that black voters would have more influence as county-wide "swing" voters in at-large elections than as majority in a single-member district, but rejecting that as a proper basis for relief under § 2 of the Voting Rights Act), vacated, 873 F.2d 248, on rehearing, 899 F.2d 1012 (11th Cir.1990) (en banc).
The Gardner parties' arguments regarding "influence" districts outside of Chicago are based primarily on overall population figures, not voting age population. Brace testified about the breakdown of major voting blocs, and the ability of minority voters *716 to play a "swing" role, in various elections in the challenged districts. This analysis is difficult to evaluate without looking at the voting age populations in the state-approved districts. Generally, minority voting age population is presumed to be lower than the overall minority population. See, e.g., Ketchum, 740 F.2d at 1415 (explaining 65% minority population guideline for opportunity to elect candidates as including 5% adjustment for "young population"). The voting strength of the minority populations is therefore presumably weaker than their overall population numbers would suggest.
The largest minority population increases sought in this case are 11% in District 33 on the northwest side of Chicago, which would raise the Hispanic population to 50%, and almost 10% in Waukegan, which would raise the total minority population to 44.2% in one district. Increases of this size would likely increase the political strength of minority voters, assuming they would vote as a reasonably unified bloc. It would be difficult, however, to quantify the increased strength; any analysis would require a substantial amount of speculation regarding the minority groups' cohesiveness and ability to form alliances with other groups in order to exercise some measure of voting control. Moreover, minority voting strength would decline in adjoining districts that would lose minority voters. The net effects are uncertain.
At the other end of the scale, minority population increases of only 1% or less are sought in districts around Rock Island, Springfield and Champaign-Urbana, and even with such increases, none of the districts would have a minority population above 16%. The "fracturing" in these areas appears insignificant. Although it is theoretically possible for a 1% increase in such relatively small voting groups to provide the decisive margin in an election, the Gardner parties have failed to show that this possibility has legal significance. Rather, these claims illustrate what Justice Cardozo called the "tendency of a principle to expand itself to the limit of its logic." Krulewitch v. United States, 336 U.S. 440, 445, 69 S.Ct. 716, 719, 93 L.Ed. 790 (1949) (Jackson, J., concurring) (quoting Benjamin Cardozo, The Nature of the Judicial Process, 51). If 10% of the voters can "swing" an election, perhaps so can 1% or 0.1%. A single voter is the logical limit. The Gardner parties need more than logic; they need proof. The evidence, however, does not clearly show that a 13.0% minority population in a Springfield district would be significantly more influential than the 12.7% provided for, or that a 12.8% minority would be significantly more powerful than 11.9% in a Champaign-Urbana district.
The Gardner and Mendez parties have failed to show that the state-approved map violates their rights under § 2 of the Voting Rights Act with regard to their "influence" or "swing" potential in any of the challenged districts. Their arguments in this regard are speculative and unpersuasive. Moreover, there are serious questions as to whether "swing" claims are legally cognizable under the Voting Rights Act, see Hastert, 777 F.Supp. at 651-55, and whether they are legally manageable. See Note, Compensatory Racial Reapportionment, 25 Stan.L.Rev. 84, 99-100 (1972) (discussing possible "vote maximization test" with a minority group set up as the "swing vote" in several districts rather than as the majority in a single district; despite theoretical merit, "the courts have been both unable and unwilling to make such speculative assessments on the outcome of political events. Realistically, such a test would be judicially unworkable.") (emphasis added).
Moreover, an inability to elect a group's chosen candidates or to "swing" elections does not necessarily mean a lack of influence. Voters for losing candidates are "usually deemed to be adequately represented by the winning candidate and to have as much opportunity to influence that candidate as other voters in the district." Davis v. Bandemer, 478 U.S. 109, 132, 106 S.Ct. 2797, 2810, 92 L.Ed.2d 85 (1986) (plurality opinion).
Accordingly, the court finds for the Redistricting Commission and Reed on the "fracturing" counterclaims of the Gardner *717 and Mendez parties regarding the Hispanic community on the northwest side of Chicago and of the Gardner parties regarding African-American and Hispanic communities elsewhere around the state.

III. 14th and 15th Amendments
The Gardner parties, in Count IV of their amended counterclaim, allege that the state-approved redistricting plan violates their equal protection rights under the 14th Amendment and their voting rights under the 15th Amendment. In support of these claims, they relied upon the same evidence that was introduced regarding their Voting Rights Act claims.
Racially motivated drawing of redistricting lines, if intended to minimize or cancel the voting strength of a racial minority, violates both the 14th Amendment equal protection clause and the 15th Amendment. City of Mobile v. Bolden, 446 U.S. 55, 62-66, 100 S.Ct. 1490, 1497-99, 64 L.Ed.2d 47 (1980); Hastert, 777 F.Supp. at 645; see also Beer v. United States, 425 U.S. 130, 142 n. 14, 96 S.Ct. 1357, 1364 n. 14, 47 L.Ed.2d 629 (1976) (noting that the Supreme Court has never found a reapportionment plan in violation of the 15th Amendment). The court, however, as discussed previously, finds that the state-approved map does not illegally cancel or weaken the voting strength of African-American or Hispanic voters. Additionally, we find a lack of evidence that the Redistricting Commission was motivated by racial concerns or that the map which the Illinois Supreme Court approved was drawn along racial lines. See Wright v. Rockefeller, 376 U.S. 52, 56-57, 84 S.Ct. 603, 605-06, 11 L.Ed.2d 512 (1964). Therefore, in addition to failing to prove a discriminatory effect for 14th and 15th Amendment purposes, the Gardner parties have also failed to prove a discriminatory motive as required under those amendments. The court accordingly finds for the Redistricting Commission and Reed on Count IV of the Gardner parties' counterclaim.

IV. Declaratory Judgment
The Redistricting Commission and Reed have pursued their complaint for a declaratory judgment under 28 U.S.C. §§ 2201, 2202 finding that the redistricting plan approved by the Illinois Supreme Court is valid under the Voting Rights Act and the Constitution. In light of the evidence in this case, and as discussed above, the court finds that the state-approved plan does not violate the rights of minority voters under the § 2 of the Voting Rights Act, or the 14th or 15th Amendments. Additionally, there is an actual case or controversy regarding the validity of the state-approved plan in view of the opposition to that plan at trial by the Gardner and Mendez parties, as well as the Task Force defendants. See Atlanta Int'l Ins. Co. v. Atchison, T. and S.F.R. Co., 938 F.2d 81, 83 (7th Cir.1991) (actual controversy required before federal court can exercise its discretionary power to issue declaratory judgments). The court deems it appropriate to issue the declaratory relief requested by the Redistricting Commission and Reed, and the state-approved redistricting plan is therefore declared to be in compliance with the applicable federal law and constitutional provisions.

CONCLUSION
The court finds, based on the record as a whole, that the redistricting plan for the Illinois General Assembly approved by the Illinois Legislative Redistricting Committee and the Illinois Supreme Court complies with the Voting Rights Act, the 14th Amendment and the 15th Amendment. The plan provides a meaningful opportunity for minority voters to elect candidates of their choice in areas where this opportunity is warranted by their population numbers, and does not intentionally discriminate along racial lines.
Consequently, the court finds for plaintiff/counter-defendants Redistricting Commission and Reed on Counts I and IV of the Gardner defendant/counter-plaintiffs' counterclaim, and on the Mendez defendant/counter-plaintiffs' counterclaim; Counts II and III of the Gardner defendants' *718 counterclaim are dismissed; and the state-approved redistricting plan is declared valid under the applicable federal law and constitutional provisions. The Redistricting Commission and Reed's motion for summary judgment is denied to the extent it seeks to bar the Gardner and Mendez counterclaims on grounds of res judicata and the Rooker-Feldman doctrine, and is otherwise rendered moot by the court's judgment.
IT IS SO ORDERED.
NOTES
[1] Additional background information on the Redistricting Commission and this litigation can be found in this court's prior opinion allowing the plaintiffs to file a third amended complaint. Illinois Legis. Redist. Comm'n v. LaPaille, 782 F.Supp. 1267 (N.D.Ill.1991).
[2] On February 24, 1992, the Illinois Supreme Court denied nine motions in the case, including motions to recall the court's mandate and for rehearing filed by several parties to both that case and the proceedings here: Illinois Attorney General Roland W. Burris, a group of African-American voters designated as the Gardner counter-plaintiffs here, and several of the Hispanic voters designated as the Mendez counter-plaintiffs here.
[3] Reed was added as a plaintiff in the Redistricting Commission's third amended complaint. On January 13, 1992, the day before the modified plan was approved by the Illinois Supreme Court, the Commission was granted leave to amend its third amended complaint to incorporate the modified plan.
[4] The dismissed counts were Count II, alleging partisan gerrymandering in violation of the Gardner counter-plaintiffs' 14th Amendment equal protection rights and 15th Amendment voting rights, and Count III, alleging violation of their 14th Amendment due process rights. Illinois Legis. Redist. Comm'n, 782 F.Supp. 1272 (N.D.Ill.1992).
[5] Counts II and III of the amended Gardner counterclaim are dismissed for the reasons set forth in this court's January 24, 1992, 782 F.Supp. 1272, order pertaining the same counts in the initial counterclaim.
[6] The Mendez counter-plaintiffs' motion to dismiss without prejudice (styled as a "motion to withdraw portions of counterclaim") their Voting Rights Act "fracturing" or vote dilution claims with regard to the southeast side of Chicago, Leyden and Proviso Townships, Aurora and Waukegan was taken under advisement on January 31, 1992. The court now dismisses those claims with prejudice pursuant to Fed. R.Civ.P. 41(a)(2). The defendants would suffer legal prejudice if the Mendez parties were allowed to refile those claims and the defendants were forced to endure the costs of another trial on similar issues to those which have already been tried. See Ratkovich ex rel. Ratkovich v. Smith Kline, 951 F.2d 155, 157-58 (7th Cir. 1991).
[7] On cross-examination, when asked whether he agreed that 65% is the amount "generally presumed necessary," Brace said "[p]resumed without any analysis, yes; but one has to do the analysis" (Trial Transcript at 218). Later on cross, Brace described the 65% figure as a "rough rule of thumb" and said the percent actually needed varies between different areas (Tr. at 225-27). Brace also acknowledged stating, in his article Minority Voting Equality: The 65 Percent Rule in Theory and Practice, 10 Law and Policy 43 (January 1988), based on a review of 20 years of election returns in various parts of the country including Chicago, that a 62.1% minority population was sufficient to equalize minority and white voter turnout (Tr. at 223, 226-27). He additionally conceded that, in the article, he found that only a 1% upward adjustment was needed for minorities in Chicago to equalize their voter registration with that of whites, instead of the 5% figure for this purpose which is included in the 65% overall "rule of thumb" (Tr. at 226-28).
[8] The Gardner parties also introduced without objection the affidavits of 14 incumbent African-American members of the Illinois General Assembly and of James W. Compton, president of the Chicago Urban League. These affidavits, which were initially filed with the Redistricting Commission, detail the splitting of wards and community groups in the state-approved plan. Both of the principal expert witnesses who testified at trial, Brace for the Gardner parties and Richard Engstrom for the Commission and Reed, said they considered the affidavits in reaching their conclusions.
[9] The Gardner parties' amended counterclaim lists additional areasJoliet, Elgin, Decatur, Bloomington-Normal, and East St. Louis ("Metro East")that were allegedly "fractured." These areas, however, were not discussed in the Gardner parties' post-trial brief and proposed findings of fact and conclusions of law. Any claims regarding these areas are therefore waived. See United States v. Dunkel, 927 F.2d 955, 956 (7th Cir.1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); United States v. Giovannetti, 919 F.2d 1223, 1230 (7th Cir.1990) ("A litigant who fails to press a point by supporting it with pertinent authority or by showing why it is a good point despite a lack of authority ... forfeits the point. We will not do his research for him") (emphasis in original; citations omitted).
[*] Hispanic only.
[**] African-American only.